# Richmond.

## FRANCES MEALY v. COMMONWEALTH.

### January 18, 1923.

1. HOMICIDE—*Self-Defense—Murder or Manslaughter—Questions of Law and Fact—Case at Bar.*—In the instant case, a prosecution of a wife for the killing of her husband, it appeared that there had been repeated difficulties between the parties in which neither was without blame. The homicide was preceded by a violent quarrel and fight, in which there might be a difference of opinion as to who was the aggressor. The wife ran from the room where the fight took place, secured a gun, returned and shot deceased in the back as he sat at a table. The defense relied partly on the theory of self-defense, but there was no evidence upon which to base this theory. The only debatable question was whether the crime was wilful and deliberate, and hence murder; or done in the heat of passion, and hence manslaughter.

   *Held:* That this was a question for the jury, and their verdict could not be disturbed unless the trial court committed some error of law during the trial.

2. HOMICIDE—*Deadly Weapon—Previous Possession of Weapon—Purpose for which Possession of Weapon Acquired.*—The test of the criminal intent in the use of a deadly weapon is to be found, not in the manner in which or the purpose for which the previous possession of the weapon was acquired, but in its deliberate use for a deadly purpose.

3. HOMICIDE—*Deadly Weapon—Previous Possession of Weapon—Purpose for which Possession of Weapon Acquired—Case at Bar.*—In a prosecution for homicide the court instructed that a mortal wound given with a deadly weapon in the previous possession of the slayer, without adequate provocation, was *prima facie* wilful, deliberate, and premeditated killing. It was contended that this instruction was erroneous because the previous possession necessary to justify such an instruction must be understood as a possession originating in previous preparation for the crime.

   *Held:* That there was no merit in this contention.

4. HOMICIDE—*Provocation—Instructions — Murder or Manslaughter — Evidence to Support Instructions.*—In the instant case, a prosecution for homicide, the defense objected to an instruction to the effect that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any provocation or even with slight provoca-

tion, was *prima facie* murder, on the ground that the uncontradicted evidence showed such grievous provocation as to reduce the offense to manslaughter, and that, therefore, no instruction should have been given which would have permitted a verdict of guilty of murder. *Held:* That there was no merit in this contention, as although if accused's acccunt was true she had great provocation, yet there was room for the jury to doubt the accuracy and truthfulness of her testimony, and there were other instructions in the case telling the jury that if the shooting was done upon a sudden provocation, without malice, the killing was manslaughter.

5. INSTRUCTIONS—*Instructions Directing Verdict Upon a Partial View of the Evidence—Objection to Instruction Without Foundation.*—In the instant case, a prosecution for homicide, the defense objected to an instruction on the ground that it undertook to cover the whole case, concluding with a direction to find the prisoner guilty, but omitted any reference to many essential features of the evidence. No attempt was made to point out to the Supreme Court of Appeals what essential features were omitted from the instruction. The proposition upon which the objection is based is sound, but that proposition did not apply to the instruction in question.

6. HOMICIDE—*Murder in the Second Degree—Instructions.*—An instruction which, fairly interpreted, told the jury that if the defendant, without the provocation of hot blood or sudden quarrel, wilfully killed the deceased but without premeditation, she was guilty of murder in the second degree, is not erroneous.

7. HOMICIDE—*Instructions—Instructions not Supported by the Evidence—Reference to Mutual Combat.*—In a prosecution for homicide where there was no evidence of any mutual combat, a reference to the law as to a killing in mutual combat in an instruction for the Commonwealth might well have been omitted altogether, but when substantially the same thing was used in instructions given at the instance of the accused, and the reference to the mutual combat would necessarily have been treated by the jury as unimportant surplusage, defendant could not have been injured by such a reference.

8. HOMICIDE—*Cooling Time—Instructions—Case at Bar.*—In the instant case, a prosecution of a wife for the killing of her husband, there had been numerous previous difficulties between the parties and instances of ill treatment of the wife, and the homicide itself was immediately preceded by a quarrel and a fight. The trial court instructed the jury that if there had been disagreements between the deceased and accused, and the deceased had beaten accused on occasions prior to the time of the homicide, and that accused had sufficient time to cool, she could not avail herself of such previous ill treatment. It was objected to this instruction that there was no evidence from which it could have been inferred that there was any cooling time.

*Held:* That it was manifest that the court could not have meant that the cooling time referred to in the instruction had any reference to the provocation offered the prisoner on the day of the homicide. The reference was clearly to ill treatment prior to that day, and as thus understood the instruction was right.

9. HOMICIDE—*Cooling Time—Instructions—Case at Bar.*—In the instant case, a prosecution of a wife for the killing of her husband, there had been numerous previous difficulties between the parties and instances of ill treatment of the wife, and the homicide itself was preceded by a quarrel and a fight. The trial court instructed the jury that if there had been disagreements between the deceased and accused, and the deceased had beaten accused on occasions prior to the time of the homicide, and that accused had sufficient time to cool, she could not avail herself of such previous ill treatment. It was objected to this instruction that it told the jury that accused could not avail herself of the ill treatment received by her from deceased on prior occasions, and that the jury ought to have been permitted to consider such previous ill treatment as tending to show the absence of malice and premeditation and that accused acted in the heat of blood.

*Held:* That there was nothing in this contention as the instruction expressly told the jury that the ill treatment was only to be disregarded if there had been sufficient cooling time.

10. HOMICIDE—*Provocation—Previous Ill Treatment of Accused by Deceased—Dangerous Character of Deceased—Self-Defense—Case at Bar.*—In the instant case, a prosecution of a wife for the killing of her husband, it was claimed that the prisoner ought to have been allowed the benefit of the evidence of previous attacks and beatings by the deceased as tending to show justification on the ground that he was a quarrelsome, dangerous, and ferocious man.

*Held:* That the evidence was not admissible for this purpose because there was no foundation in the case for the theory of self-defense, and the dangerous character of the deceased was immaterial.

Error to a judgment of the Circuit Court of Goochland county.

*Affirmed.*

The opinion states the case.

*D. H. & Walter Leake,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

KELLY, P., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit court sentencing the defendant, Frances Mealy, to the penitentiary for a term of six years, for the murder of her husband, Ocie Mealy.

[1] For some years prior to the homicide there had been frequent and serious disagreements between the defendant and her husband. She had left him a number of times, because, as she alleged, he had abused and beaten her, and she had twice brought suit against him for divorce, first in 1909 charging cruelty, and again in 1915 charging cruelty, and also charging improper relations with one Lois Cook and other women whose names were not given. Neither of these suits was pressed to a conclusion. The many quarrels and separations between these parties were always followed by reconciliations, brought about, as the defendant testified, because her husband would not let her "see any peace," would promise to "do better," and "would come and out talk her."

Ocie Mealy was a large and powerful man. The evidence seems to show rather clearly that he had often beaten his wife. It also appears, however, that she was not without fault. About two years before the killing, when an officer went to arrest her on a warrant sworn out by the woman Lois Cook, the defendant said to her husband, "I am going to kill you. I am going to blow you down at Lois Cook's door." At another time she followed him to his brother's home with a club in her hand and said to his brother that "if they wanted him they had better keep him away from there (meaning her home) or she would kill him." About eighteen months before the homicide she had been required to give a bond to keep the peace upon a warrant sworn out

by her husband because she had threatened his life. He had also been required to give a peace bond two or three times, but at whose instance the record does not clearly show. Perhaps a fair inference is that he was required to give these peace bonds because of his treatment of his wife; and it also seems probable that as between the two he was the chief offender.

The homicide occurred in the evening just after dark. Only the accused and the deceased were present. The deceased had left the house on some errand and the defendant had prepared his supper and placed it on the table in the kitchen. When he returned he asked if she did not have a letter belonging to him, and she replied in the affirmative. The letter in question was one which she had taken from the postoffice. It was addressed to her husband and was written by Corinne Cook, a daughter of Lois Cook. The letter enclosed a postoffice money order for a small amount, and the subject matter of the letter was free from improper suggestions. The defendant had opened it, but claimed to have done so by mistake.

After stating that her husband had asked about the letter and that she admitted having it, the defendant further testified in part as follows: "He asked me what I was doing with his letter, and then the fight started. He jumped on me, beat me, choked me and beat me around the room. Said he was going to kill me. I got loose from him and ran and got the gun and came back in the kitchen. He was sitting at table and started to get up and I shot him; said I was tired of him beating me." Her testimony as a whole shows that she went back with the gun to kill him, and that she was not moved to fire the fatal shot by any action on his part after she returned. He was sitting down when she fired, and the shot took effect in his back.

A pane of glass had been broken out of the kitchen window, and it seems to have been the theory of the Commonwealth that she fired at him from the outside and through the opening in the window pane. Dr. Leake, who examined the body, testified in effect that the position of deceased's body with relation to the broken window pane was such as to indicate that the shot came from that direction. He also said that in his opinion if the shot had been fired in the room there would have been powder marks on the body, and that there were no such marks. He added, however, that it was all a matter of guess work as to where the muzzle of the gun actually was. If this question was material it was for the jury to determine, but we do not think it matters whether the shot was fired through the window or from a point within the room. He was sitting down and the defendant shot him in the back, and we cannot see that her exact position makes any difference. It is true that she relied partly on self-defense, and in order to do this it would, of course, have to appear that she was in the room, but her own testimony as a whole (together with the situation and condition in which the body was found) shows that she was out of danger and voluntarily returned and killed him after he had seated himself at the table to eat his supper. There was no evidence upon which to base the theory of self-defense. The only debatable question is whether the crime was wilful and deliberate, and hence murder; or done in the heat of passion, and hence manslaughter. This was a question for the jury, and we cannot disturb their verdict unless we shall find that the court committed some error of law during the trial.

1. It is insisted that the court erred in giving certain instructions to the jury. A number of these are conceded to be correct if the evidence was sufficient to war-

rant a conviction of murder in the second degree. Enough has already been said to indicate our views on this question.

Especial complaint is made of the following instruction which was given for the Commonwealth over the defendant's objection, namely:

[2, 3] "The court instructs the jury that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any provocation or even with slight provocation is *prima facie* wilful, deliberate and premeditated killing and throws upon the prisoner the necessity of showing extenuating circumstances."

The objection urged to this instruction is twofold. It is said, in the first place, that the possession of the gun by the defendant was not such "previous possession" as was legally requisite in order to make the instruction applicable. To sustain this contention we would have to overrule a long line of Virginia decisions, too numerous and familiar to require citation here.

The rule applied in this instruction has its foundation in the principle of criminal law that every person is presumed to have intended the natural and probable consequences of his voluntary acts. The test of the criminal intent in the use of a deadly weapon is to be found, not in the manner in which or the purpose for which the previous possession of the weapon was acquired, but in its deliberate use for a deadly purpose. For example, in *Honesty's Case*, 81 Va. 283, 295-6, the accused struck the fatal blow with a brickbat which he had but a moment before picked up, and in *Jones' Case*, 100 Va. 842, 855, 41 S. E. 951, the prisoner killed his victim with a post hole digger which he had in his hand before and at the time the altercation began, and with which he was peacefully prosecuting the work of building a fence. In both of these cases it was contended, with respect to an

instruction exactly like the one here complained of, that the "previous possession" necessary to justify such an instruction must be understood as a possession originating in previous preparation for the crime; but in both cases this court rejected that contention.

[4] The second objection to the instruction is that the uncontradicted evidence showed such grievous provocation as to reduce the offense to manslaughter as a matter of law, and that, therefore, neither this nor any other instruction ought to have been given which would have permitted a verdict finding the defendant guilty of murder. We condemned an instruction like this one in *Richardson's Case*, 128 Va. 691, 104 S. E. 788, on the ground that the killing was shown, without any conflicting evidence and without a basis for any other theory, to have been committed in a mutual combat and under great provocation. That case is relied upon here, but it has no controlling effect because in the instant case the nature and extent of defendant's provocation, and the effect which it had upon her, was a question for the jury. If her account be altogether true, she did have great provocation, but there was room for the jury to doubt the entire accuracy and truthfulness of her testimony. It is perfectly manifest that the trouble, or, as she said, "the fight," started over the letter from Corinne Cook, who was a daughter of the other woman in the case. The contents of that letter were innocent enough in themselves, but the jury might well have believed that she did not innocently open it, and that she was as much to blame for the quarrel and fight as her husband. Then, too, it was for the jury to determine the extent to which she was abused by her husband. She said his attack upon her was a very violent one, and that he beat her and choked her, but there were no visible evidences of any such attack on her body. She

had previously threatened his life, and it was for the jury to say whether she was acting under the influence and control of the passion engendered by the alleged provocation, or by previous grudge, and by her anger and jealousy aroused by the Corinne Cook letter. It is significant that the deceased did not follow her further than the door of the room after the fight between them ended, but had seated himself at the table and was eating his supper, offering neither threats nor provocation, at the time of the shooting. There were other instructions in the case telling the jury that if the shooting was done upon a sudden provocation or quarrel without malice aforethought, the killing was manslaughter and not murder. The instructions in this respect were so plain and emphatic as to leave no room for any misconception on the part of the jury.

Particular complaint also is made of instruction No. 13, given for the Commonwealth over the defendant's objection, as follows:

"The court instructs the jury that if they believe from the evidence that there had been disagreement between the accused and the deceased, and that upon previous occasions he had beaten and choked her and that upon the evening of the homicide there was a personal difficulty in the course of which the deceased choked the accused and that she ran out of the kitchen and secured a gun and returned to the kitchen and shot and killed the accused when he was sitting at the table eating his supper, then if there had existed no previous design to take the life of the accused the killing was murder of the second degree and they should convict and fix her punishment at not less than five nor more than twenty years in the State prison. Provided you believe the killing was not done in the heat of blood upon a sudden quarrel and mutual combat."

38

It is apparent that the word "accused" in the latter part of this instruction was inadvertently used instead of the word "deceased."

[5-7] The first objection urged against this instruction is that it undertakes to cover the whole case, concluding with a direction to find the prisoner guilty, but omits any reference to many essential features of the evidence. No attempt is made to point out to us what essential features were omitted from this instruction. The proposition upon which this objection is based is sound and has been frequently approved by this court, but we do not think that proposition applies to this instruction. Fairly interpreted, it told the jury that if the defendant, without the propulsion of hot blood or sudden quarrel, wilfully killed the deceased but without premeditation, she was guilty of murder in the second degree. Under the instructions as a whole, this is the only meaning which the jury could reasonably have ascribed to this instruction, and as thus understood it was good law. It is true that the latter part of the instruction might have been more accurately phrased, and might have omitted altogether any reference to a mutual combat. There was no evidence of any mutual combat, but substantially the same language was used in certain of the instructions given for and at the instance of the accused; and, furthermore, the reference to the mutual combat would necessarily have been treated by the jury as unimportant surplusage. In no event could such a reference have injured the defendant.

[8, 9] Another objection to this instruction is that it was fundamentally wrong in allowing the jury to consider the case as one of murder in any degree, but what we have already said concludes this contention against the defendant.

It is insisted that the court erred in giving instruction

No. 14 on behalf of the Commonwealth, which was as follows:

"The court instructs the jury that if they believe from the evidence that there had been disagreements between the deceased and the accused, and that the deceased had beaten and ill treated the accused on occasions prior to the time of the homicide, and that the accused had sufficient time to cool from the passion occasioned by such beating or ill treatment, then she cannot avail herself of such beating or ill treatment. It might be cause for a divorce, but cannot be pleaded in defense in this case, and they should consider only such provocation, if any, as occurred on the day of the homicide."

The first point made against this instruction is that there was no evidence from which it could have been inferred that there was any cooling time, the argument being that the defendant escaped from the deceased, got the gun and came immediately back to the kitchen and fired the fatal shot. It is manifest, however, that the court did not mean, and the jury could not have understood the court to mean, that the cooling time referred to in the instruction had any reference to the provocation offered the prisoner on the day of the homicide. The reference therein clearly was to ill treatment of the accused by the deceased on occasions prior to that day, and as thus understood the instruction was plainly right.

Further objection is made to this instruction because it told the jury that the prisoner could not avail herself of the ill treatment and beating received by her from the deceased on prior occasions, the argument being that the jury ought to have been permitted to consider such previous ill treatment as tending to show the absence of malice and premeditation, and as tending to show that she acted in the heat of blood. There is noth-

ing in this contention, however, because the instruction expressly told the jury that they were only to disregard the ill treatment of the prisoner by her husband in case they believed from the evidence that sufficient time had elapsed to allow her passion occasioned thereby to subside.

[10] It is further claimed that the prisoner ought to have been allowed the benefit of the evidence as to previous attacks and beatings by the deceased as tending to show justification on the ground that he was a quarrelsome, dangerous and ferocious man, but the evidence was not admissible for this purpose because there was no foundation in the case for the theory of self-defense, and the dangerous character of the deceased was, therefore, not material. *Harrison's Case*, 79 Va. 374, 379, 52 Am. Rep. 634.

The other assignments need not be noticed as they are necessarily disposed of adversely to the defendant by what has already been said.

The case, upon the merits, was essentially one for a jury to try. The trial was conducted fairly and upon correct legal principles. We find no error in the judgment complained of, and it will be affirmed.

*Affirmed.*