COURT OF APPEALS OF VIRGINIA


Present: Judges Coleman, Willis and Elder
Argued at Salem, Virginia


VICTORIA SHELTON SANDS

                                                OPINION BY
v.    Record No. 1567-99-3           JUDGE LARRY G. ELDER
                                           NOVEMBER 7, 2000
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
                      Charles J. Strauss, Judge

            Philip G. Gardner (R. Reid Young, III;
            Gardner, Gardner, Barrow & Sharpe, P.C.; Law
            Offices of R. Reid Young, III, on briefs),
            for appellant.

            Richard B. Smith, Senior Assistant Attorney
            General (Mark L. Earley, Attorney General, on
            brief), for appellee.

     Victoria Shelton Sands (appellant) was convicted in a jury

trial for the first degree murder of her husband, Thomas Sands

(Sands), and use of a firearm during the commission of murder.  On

appeal, she contends the trial court erred by refusing to instruct

the jury on the law of self-defense.  We agree.  We, therefore,

reverse the convictions and remand for a new trial.

                        I.  BACKGROUND

     In reviewing the trial court's refusal to grant a defendant's

proffered jury instruction, we view the evidence in the light most

favorable to the defendant.  See Boone v. Commonwealth, 14 Va.

App. 130, 131, 415 S.E.2d 250, 251 (1992).  So viewed, the

evidence showed that appellant and Sands were married in 1983.

Two years after they were married, Sands began beating appellant. The beatings became progressively worse over time and, "[a]t the end[, they occurred] on a daily basis." Sands was not gainfully employed for the last eight to ten years of their marriage, during which time he used and sold cocaine, marijuana and moonshine.

Appellant wanted to take her four-year-old son, leave Sands and get a divorce. Sands told her she could not leave and threatened repeatedly to kill her and her parents if she did. She said she believed Sands would have found and killed her if she had gone to a shelter. Sands also refused appellant's requests that he leave the marital residence. Whenever she broached the subject of divorce, he beat her. When she broached the subject in late July 1998, Sands beat her and then held her hostage in their home for three weeks.

On August 12, 1998, appellant spoke to her parents and asked for their help in trying to get Sands arrested for his illegal activities, in the hope that his arrest and conviction would free her from his repeated abuse and threats. However, on August 17, before appellant's parents were able to take any significant action, they were seriously injured in an automobile accident. Appellant "knew . . . [she] couldn't do anything" further on that front because, if she took any direct action to report Sands' activities to the police herself, she believed Sands would find out and kill her.

-

On August 17, 1998, Sands accompanied appellant to the hospital in North Carolina to visit her injured parents. Sands returned home that day while appellant remained with her parents. When appellant and Sands spoke several times that week, Sands expressed his anger at the fact that appellant wanted to stay to care for her hospitalized parents rather than to come home to him. When appellant returned home on the evening of Saturday, August 22, 1998, intending to stay only overnight before returning to help her parents in North Carolina, Sands was angry because she had been gone and did not call to say she was coming home. Sands said he had been up all week since returning home the previous Monday. Sands "went into a rage," beat appellant, and threatened to kill her, saying, "you will die, I promise you, you will die." Appellant did not flee the marital home because she was afraid Sands would come after her and kill her as he had threatened. Between Saturday night and Sunday morning, Sands hit appellant "[h]undreds and hundreds of times," and threatened her with a gun he always carried, which he repeatedly put up her nose.

At approximately 11:00 a.m. on Sunday, August 23, appellant tried to hide Sands' gun, and the couple got into another argument on the back porch of their home. Despite the fact that appellant held the firearm during this time, Sands pushed her into a sink and "threw" her down five or six concrete steps. Appellant found herself lying on the ground with Sands sitting on top of her holding the firearm. After Sands pinned appellant to the ground,

-

he again told her he would kill her, and he fired two shots into the ground near her. Once back inside the house, Sands tried to goad appellant into shooting him. He picked up the gun, which he had previously placed on the counter, and cocked it. Sands then said, "[I]f you want to shoot me here's the gun between us." The couple's four-year-old son entered the room, and the conflict came to a temporary end.

Shortly thereafter, appellant's aunt, Sallie Hodges, came to the house to get the couple's son so she could care for him while appellant returned to North Carolina to look after her parents. Appellant appeared "sad" and the side of her face looked bruised. Sands was pacing and calling appellant derogatory names. Sands told Hodges he would not allow appellant to leave. He then said to Hodges, "I'll kill you and your whole family. . . . I've knocked off a few [people] and I can knock off a few more too." Appellant refused to allow Hodges to take the couple's son, and Hodges left.

When appellant's brother arrived to take appellant to visit their parents, Sands would not allow appellant to leave and told her brother that he would take appellant to North Carolina himself.

Sands remained home all day, where he used cocaine and drank alcohol. Periodically, he lay down to watch television in the bedroom for five or ten minutes, but he always got up to beat appellant again and threaten her with the gun. He continued this

-

pattern throughout the day.  As the day progressed, Sands continued to tell appellant he was going to kill her, and appellant said she believed he was going to do it.

At about 10:00 p.m., appellant was able to use the telephone. She called Hodges to come get the couple's four-year-old son and take him to her house.  While appellant was on the phone with Hodges, Donald Wright, the couple's neighbor, came to the couple's house and agreed to take the child to Hodges' house.  Appellant said she wanted her son away from the house because she "sensed" Sands was going to kill her.  After appellant called Hodges, she then called her sister-in-law, Angela Shelton, and asked Shelton to come to her house.  Before Shelton arrived, Sands beat appellant again.  During this beating, which appellant described as the "longest," Sands hit appellant's head with the butt of his gun and again put the barrel of the gun up her nose.  He then returned to his position in the bedroom in front of the television.

When Shelton arrived, appellant was crying and upset. Shelton and appellant went into the bathroom where Shelton helped appellant undress so they could look at appellant's bruised and beaten body.  After seeing the extent of her injuries, appellant started shaking and said, "the devil, look at what the devil's done to me.  I've got to get this devil out of my house.  He's evil."  Appellant then "ran out of the bathroom and the door of the living room, . . . came back to the kitchen, . . . opened the

-

cabinet door, . . . got the gun, . . . went to the bedroom and . . . shot [Sands]" five times while he was lying in bed, awake, watching television.  After appellant shot Sands, she walked out of the bedroom, laid the gun down, and called the police.

An officer who saw appellant at the scene after the shooting testified that her bruises were readily apparent and that her nose was "twisted to the side."  He thought her ribs and nose were broken.

After the shooting, appellant was examined by an emergency room physician, who found that she had "multiple bruises and contusions throughout her body, most of which were extensive in the upper arms and in the flanks."  The deceased had bruising on the first and second knuckles of his right hand and on the first knuckle of his left hand.

Appellant's mother, aunt, and sister-in-law testified that they had seen bruises on appellant numerous times in the months preceding the shooting, and appellant's aunt and sister-in-law testified that they observed bruises on her the day of the shooting.

At trial, appellant proffered Instruction A on the law of justifiable homicide:

> THE COURT INSTRUCTS THE JURY that if you
> believe that the defendant was without fault
> in provoking or bringing on the difficulty,
> and if you further believe that the
> defendant reasonably feared, under the
> circumstances as they appeared to her, that
> she was in danger of being killed or that

-

she was in danger of great bodily harm, then
the killing was in self-defense, and you
shall find the defendant not guilty.

Although the parties' arguments on the instructions do not appear in the record, the trial court refused the instruction based on its "find[ing] that there is insufficient evidence [to support] a self-defense instruction."

## II. ANALYSIS

Appellant argues the trial court erroneously refused to instruct the jury on the law of self-defense. She contends the evidence showed that she reasonably feared imminent death or serious bodily harm at the hands of the victim and that she was without fault in bringing on the difficulty. She asserts that, although her fear of death or great bodily harm and her ability to act on that fear arose over a period of time, rather than at a particular instant, the jury should have been instructed on self-defense so that it could determine the reasonableness of her fear of imminent death or great bodily harm.

A court's "responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting Swisher v. Swisher, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1992)). "[T]he trial court should instruct the jury only on those theories of the case which find

-

support in the evidence."  Morse v. Commonwealth, 17 Va. App.
627, 632, 440 S.E.2d 145, 149 (1994).

If any evidence in the record "supports a proffered
instruction . . . , failure to give the instruction is
reversible error.  Such an instruction, however, must be
supported by more than a mere scintilla of evidence."  Boone v.
Commonwealth, 14 Va. App. 130, 132, 415 S.E.2d 250, 251 (1992)
(citations omitted).  Whether the evidence amounts "to more than
a mere scintilla . . . is a matter to be resolved on a
case-by-case basis."  Brandau v. Commonwealth, 16 Va. App. 408,
412, 430 S.E.2d 563, 565 (1993).

> Killing in self-defense may be either
> justifiable or excusable.  If it is either,
> the accused is entitled to an acquittal.
> "Justifiable homicide in self-defense occurs
> [when] a person, without any fault on his
> part in provoking or bringing on the
> difficulty, kills another under reasonable
> apprehension of death or great bodily harm
> to himself."

Smith v. Commonwealth, 17 Va. App. 68, 71, 435 S.E.2d 414, 416
(1993) (quoting Bailey v. Commonwealth, 200 Va. 92, 96, 104
S.E.2d 28, 31 (1958)) (citation omitted).  In the case of
justifiable homicide, "[in which] the accused is free from fault
in bringing on the fray, the accused 'need not retreat, but is
permitted to stand his [or her] ground and repel the attack by
force, including deadly force, if it is necessary.'"  Gilbert v.
Commonwealth, 28 Va. App. 466, 472, 506 S.E.2d 543, 546 (1998)
(quoting Foote v. Commonwealth, 11 Va. App. 61, 67, 396 S.E.2d

-

851, 855 (1990)).  Where the accused is to "some [degree at] fault in the first instance in provoking or bringing on the difficulty" but "retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm," the accused has committed excusable homicide and also is entitled to an acquittal.  Bailey, 200 Va. at 96, 104 S.E.2d at 31.

"[W]hether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted."  McGhee v. Commonwealth, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978).  However, "the test is not [merely] whether the accused thought or believed at the time of the killing that he was in imminent danger of great bodily harm . . . .  He [both] must have believed and must have had reasonable ground to believe, at the time, that he was in such danger."  Perkins v. Commonwealth, 186 Va. 867, 877, 44 S.E.2d 426, 430 (1947).  "[F]ear alone" is not sufficient to justify a person's intentionally inflicting a mortal wound upon another; to justify taking the life of another, "there must be an overt act indicating the victim's imminent intention to kill or seriously harm the accused."  Smith, 17 Va. App. at 71-72, 435 S.E.2d at 417 (emphasis added).  "[T]he term 'imminent' has a connotation that is less than 'immediate,' yet still impending and present."  Sam v. Commonwealth, 13 Va. App. 312, 325, 411 S.E.2d 832, 839

-

(1991) (construing "imminence" in the context of a duress defense). Whether a threat of harm is imminent is ordinarily a question of fact to be decided "based on all of the circumstances," which may include "the defendant's ability to avoid the harm." Id. (noting other jurisdictions impose such a requirement but not addressing whether Virginia law requires such a showing).

We hold the trial court erroneously refused to instruct the jury on self-defense. Under the facts of this case, the fact finder could reasonably have concluded that appellant was without fault in beginning the altercation, reasonably apprehended she was in imminent danger of death or serious bodily harm and, thus, was justified in shooting her husband to prevent him from killing her or further inflicting serious bodily harm upon her. The record showed that appellant had suffered physical and mental abuse over the years, a pattern she knew would repeat itself. On the day before the shooting, Sands told appellant, "you will die, I promise you, you will die." Throughout the day of the shooting, Sands refused to allow appellant to leave the home, repeatedly beat and threatened to kill her, and pushed the barrel of a firearm into her nose, applying enough pressure to twist her nose to one side. Between beatings, he reclined in front of the television in the bedroom. Within the hour before the shooting, Sands continued to beat appellant, inflicting what appellant described as the "longest" beating. Although Sands had threatened

-

to kill her before, appellant "sensed" he meant to carry out his threat that evening.

After the last beating, appellant inspected her bruises. She was so badly injured that she was physically unable to remove her own clothing and had to enlist the assistance of her sister-in-law. When appellant saw her injuries, she started shaking and told her sister-in-law, "I got to get this devil out of my house." Appellant immediately retrieved a gun, walked to the bedroom where Sands was lying on the bed watching television, and shot him five times.

The evidence, viewed in the light most favorable to appellant, supports a finding that appellant both did believe and reasonably could have believed she was in imminent danger of death or serious bodily harm. Sands had said he would kill her, held her hostage in her own home that day and had beaten her severely less than an hour earlier. Based on the history of repeated threats and beatings, appellant reasonably could have believed that Sands posed a real and immediate threat to her life and safety and that he would resume the beatings at any moment, as he had done repeatedly throughout the previous night and day. See Sam, 13 Va. App. at 325, 411 S.E.2d at 839.

"The law does not require a person to suffer the last lethal blow before being able to take up his weapon to defend his life." Smith, 17 Va. App. at 72, 435 S.E.2d at 417. Appellant had suffered years of abuse at the hands of her husband,

-

and she testified that, over time, the abuse had become more severe.  The fact finder could have concluded that Sands' unrelenting physical abuse and persistent death threats, culminating in a series of threats and physical abuse lasting for more than twenty-four hours prior to the shooting, constituted an imminent threat of death or serious bodily harm.  In a situation where her tormentor posed an ongoing threat to her life and physical well-being, appellant was entitled to have the fact finder determine whether she reasonably thought she was in imminent danger of serious bodily harm and had the right to defend herself.  She had the right to have the jury decide whether she acted reasonably in seizing an opportune time to slay her tormentor rather than risk taking defensive action after her husband had a firearm in her face or was in the process of beating her again.

Because the evidence, viewed in the light most favorable to appellant, would support a finding that the homicide was justifiable, appellant had no duty under the law of self-defense to retreat in order to be entitled to the instruction.  See, e.g., Gilbert, 28 Va. App. at 472, 506 S.E.2d at 546.  However, even assuming that a finding of "imminent harm" requires consideration of an accused's ability to flee to avoid the harm, see Sam, 13 Va. App. at 325, 411 S.E.2d at 839, the evidence, again viewed in the light most favorable to the appellant, supported a finding that appellant believed she could not flee

-

because Sands would find and kill her and a finding that this belief was reasonable under the circumstances.

We also hold the outcome of appellant's case is not controlled by Mealy v. Commonwealth, 135 Va. 585, 115 S.E. 528 (1923). In Mealy, the defendant testified that she had left her husband several times previously due to his ongoing abuse but that she voluntarily reconciled with him "because [he] . . . 'would come and out-talk her'" and "promise to 'do better.'" Id. at 588, 115 S.E. at 528. Further, Mealy previously had threatened to kill her husband, and on the evening in question, the altercation began when Mealy took from the post office and opened a letter addressed only to her husband. See id. at 588-89, 115 S.E. at 529. Thus, Mealy was not entirely without fault in beginning the altercation and was entitled, at most, to an acquittal based on excusable rather than justifiable homicide if she established that she retreated and announced a desire for peace. Although Mealy's husband had threatened to kill her shortly before his death, Mealy escaped from him, and he began eating his supper before she returned with a gun and shot him in the back. See id. at 589, 115 S.E. at 529. Therefore, no evidence supported a finding that Mealy perceived an imminent threat from which she was unable to retreat. See id. at 590, 115 S.E. at 529. She testified merely that "'[she] shot him'" because "'[she] was tired of him beating [her].'" Id. at 589, 115 S.E. at 529. She previously had left the home and returned

-

not because he threatened her but because he promised to "do better."

In appellant's case by contrast, Sands had held appellant hostage in their home on more than one occasion, including on the day of the shooting, and threatened to kill her if she tried to leave or get a divorce. During the twenty-four-hour period before the shooting, he fired two shots into the ground near her, threatened repeatedly to kill her, and repeatedly beat her and put the barrel of the gun in her nose. Finally, the evidence, viewed in the light most favorable to appellant, indicated that appellant was not at fault in beginning the altercation. Although appellant's husband was not actively engaged in attacking her at the precise moment of the fatal shooting, he had done so regularly throughout the day and had promised to continue to do so. Thus, the evidence, viewed in the light most favorable to appellant, supported a finding that appellant reasonably perceived an imminent threat of death or great bodily harm in a situation from which she reasonably believed she lacked the ability to extricate herself. Although the evidence, viewed in the light most favorable to the Commonwealth, might have supported an opposite finding, this fact was irrelevant to the court's ruling on her proffered instruction.

On these facts, the jury could have found appellant reasonably feared an imminent threat of death or serious bodily

-

harm.  Therefore, the trial court erroneously refused an instruction on self-defense.  Accordingly, we reverse appellant's convictions and remand the case for a new trial.

<u>Reversed and remanded.</u>