COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Willis and Senior Judge Hodges
Argued at Richmond, Virginia


NAKITA LASHAUN BARNES

                                    MEMORANDUM OPINION* BY
v.    Record No. 0564-01-2          JUDGE JAMES W. BENTON, JR.
                                         AUGUST 6, 2002
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
                    James F. D'Alton, Jr., Judge

          Michael HuYoung (Christopher H. Macturk;
          Barnes & Batzli, P.C., on brief), for
          appellant.

          Margaret W. Reed, Assistant Attorney General
          (Randolph A. Beales, Attorney General, on
          brief), for appellee.


     A jury convicted Nakita LaShaun Barnes of second degree

murder of Latrice Bates.  Barnes contends the trial judge erred

(i) by refusing to give jury instructions on justifiable

homicide and the defense of others, and (ii) by refusing to

grant Barnes a new trial after finding that the Commonwealth's

attorney failed to properly provide Barnes with a copy of a

Commonwealth's witness' criminal record.  We reverse the

conviction and remand for further proceedings.

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

                                    I.

        Appellant was indicted and tried for first degree murder.
At trial, LaShaunda McGee, a witness for the Commonwealth,
testified that on January 2, 2000, Berthshena Jefferson and
Waverly Epps were visiting her while she cleaned her apartment
after a New Year's party.  Latrice Bates arrived at McGee's
apartment at 3:00 p.m. with Bates's "boyfriend's sister."
According to McGee, she did not know Bates before this day.  No
evidence proved who invited Bates to McGee's apartment.  McGee
said Bates left after a brief stay.

        McGee testified that Bates returned later and that she and
Bates had a "general conversation."  McGee testified that
appellant, whom she had known for about ten years, called on the
telephone and said Bates had called appellant to ask "was
[appellant] messing with [Bates's boyfriend] at [McGee's] house
on New Year's Eve."  McGee told appellant, "hold on," and "put
the phone down."  McGee said when she returned to the telephone,
appellant asked McGee whether she had heard Bates in the
background.  McGee testified that she told appellant she was
coming to appellant's house but that appellant said "no," she
was coming to McGee's apartment.  McGee testified she told Bates
to leave because appellant was coming to the apartment, and she
then called appellant and told her not to come.  Appellant said
she was "on her way over . . . [and] hung the phone up."  McGee
testified that in an attempt to stall appellant, she again

                                    -

called appellant "and told her to stop at the store and get
. . . a Pepsi."

McGee testified she was standing on her porch when appellant arrived.  McGee testified she "ran to [appellant's] car, and . . . told her that [Bates] was in the parking lot somewhere and don't get out of the car, to pull off."  McGee recalled appellant's window was halfway down and appellant's child was in a child carrier on the rear seat.  McGee testified that appellant got out of her car.  Bates then was standing behind McGee "saying stuff" to appellant.  McGee said appellant never responded.  McGee testified that Bates and appellant began hitting each other and that she moved away from the fight when one of them hit her.  McGee saw appellant shake her head, heard something drop, and saw Bates run to her car and then to the apartment building.  Appellant drove away.  McGee said she did not see Bates threaten appellant's child.

On cross-examination, McGee testified that she had a videotape of her New Year's party which depicted Bates's boyfriend and appellant.  She denied telling Bates that appellant and Bates's boyfriend had been "messing around," denied playing the video for Bates, and could not recall whether she told Bates that appellant and Bates's boyfriend were on the tape.  She recalled telling Bates only that she had a tape showing Bates's boyfriend with his friend, Lloyd.  McGee

-

testified that Bates knew before she came to the apartment that appellant and Bates's boyfriend had been together at the party.

McGee admitted that Bates left her apartment at 3:00 p.m. "to look for [appellant's] house" and intended "to ask [appellant] about [Bates's boyfriend]." She had given Bates appellant's telephone number and knew Bates intended to call appellant. When Bates could not find appellant, Bates returned to the apartment. McGee testified that Bates called appellant from McGee's apartment and told appellant she wanted to "whip her ass."

McGee testified that although she told appellant not to come to her apartment, she admitted she did not give appellant an explanation. She also testified that she "used to keep [appellant's] kids," but she denied she was to do so that day. McGee denied that she schemed to cause Bates and appellant to fight and testified she did not "remember the fight at all." McGee said she called the police after the fight.

Berthshena Jefferson, who was in McGee's apartment when Bates arrived, testified that Bates was her friend. She recalled that when Bates returned to the apartment at 7:00 p.m. Bates called someone on the telephone. Jefferson said she did not hear the conversation. Jefferson also testified that McGee called appellant on the telephone. During one of those calls, she heard "a lot of arguing and commotion." Jefferson testified that after the calls Bates and McGee began "swapping

-

information."  Jefferson said she then advised Bates to leave the apartment and did not know where Bates went.

Jefferson testified that later, after hearing argument outside the apartment, she ran outside.  Epps and Bates's boyfriend's sister also went outside.  Jefferson saw Bates's car parked outside the apartment and saw Bates standing by appellant's car.  Jefferson testified that appellant was getting out of her car but "got back in the car" when McGee told her to do so.  Jefferson testified that Bates was then "like towards the rear end of [appellant's] car."  Jefferson also recalled that appellant's child was in a child carrier on the rear seat and that the rear window was up.  She heard Bates yelling at appellant, "I'm Twon's girlfriend.  I'm Twon's girlfriend."

According to Jefferson, Epps attempted to stop the argument, and said to McGee, "why [are] you letting this shit go down out here?"  Jefferson testified that she told appellant to get back into the car and leave, that she pulled Bates away, and that appellant came toward Bates.  Jefferson testified that she heard something hit the ground after she and Epps stopped the fighting.  Jefferson also testified she called the rescue squad and the police when she saw Bates bleeding.

Sergeant Thomas Patrick testified that after he arrested appellant, he and Detective Young interviewed her.  The video recorder failed, however, and did not record the interview session.  According to Patrick, who testified from his memory

-

and a police report he had written after speaking with appellant, appellant told him she went to McGee's apartment "to drop her baby off." When she arrived, Bates, who had threatened her that evening, approached her car. Appellant said she got out of her car and Bates began an argument. After Bates struck appellant on her upper left cheek bone, appellant retrieved a kitchen knife from her car, held it behind her back, and then struck Bates with it. Appellant said she was unsure how many times she struck Bates with the knife.

Testifying for the defense, Waverly Epps said he was at McGee's apartment when Bates arrived. He did not know Bates or appellant before that day. He testified that McGee showed a videotape of the New Year's party to Bates and that "the battery kept going dead" as the camcorder played. He testified, however, he was able to see a portion of the tape depicting appellant with Bates's "baby's daddy . . . all on her." He testified that "McGee was just boosting it up" and that Bates "got upset" after seeing the tape.

Epps also testified that McGee later called appellant on the telephone. Epps recalled that after the telephone conversation, Bates "was hyped . . . like . . . [the] sooner she come over here, I'm going to get her." He testified that later, when Bates heard a car horn, she "fl[ew] out the house." Epps testified that he then ran outside and saw Bates hitting appellant through the open window of the car. Epps testified

-

that when appellant attempted to drive away, Bates opened the car's rear door, where appellant's daughter was seated.  He heard appellant say, "My baby [is] in the car" and heard Bates reply "my baby [is] out here too."

Epps testified that he then grabbed Bates and moved her away until Bates began to hit him.  When he released her, she ran to appellant and resumed striking appellant.  He testified that appellant "never ma[d]e an attempt to move to her again, you know, to fight her again."  Epps testified that Bates "r[a]n up on [appellant] twice" and that he did not see appellant stab Bates because it apparently occurred while they were fighting.

Epps testified that during the investigation he told the prosecutor he did not want to be involved in the case and did not tell the prosecutor about the videotape.  On cross-examination, Epps admitted that he had been convicted of one felony involving the distribution of cocaine.  Further explaining the events, Epps testified that Bates "run to the car the first time, hit her . . . then [appellant] . . . rolled the window up.  Then [Bates] tried to get in the back door of the car where the baby was . . . ."  Epps testified that although appellant could have driven away, she "stopped to get out" because the car's rear door was open.

Appellant testified that she had not met Bates before that evening in the parking lot.  She testified that Bates called her and said she was going to "whip my ass about [Bates's

-

boyfriend]."  Appellant testified that she hung up the telephone during Bates's call and then called McGee to ask whether she knew "anything about it."  McGee said she did not know anything, put down the telephone, and spoke to Jefferson, who said she did not know anything.  Appellant said she told McGee, who earlier had agreed to keep appellant's child, that she was bringing the child to McGee.  Appellant testified that McGee called back and told her not to come.  When she asked for a reason, McGee said "just bring [her] a soda" when she came.

Appellant testified that, when she arrived at McGee's apartment, she did not know Bates was there.  She testified that after she sounded the horn McGee ran to the car and told her not to get out.  Bates then appeared at her car and began cursing her and punching her through the window.  Appellant said she did not know at that point who Bates was and began moving the car in reverse.  She testified that, before she could lock the door, Bates opened the rear door where her child was seated. Appellant said she "panicked," stopped the car, and grabbed the knife because Bates was at the rear open door by her child.  She testified that she initially had the knife behind her back and then brought it forward and waved it at Bates "to let her know I didn't want to fight her."  She testified that they began fighting while she had the knife in her hand and that she stabbed Bates during the fight.  When Bates suddenly stopped, the knife slipped from appellant's hand.  Appellant testified

-

that she "didn't mean to do it," that she was pregnant, and that she was protecting herself, her child, and her unborn baby.  She admitted that Bates never touched her child.

On rebuttal, McGee testified she had seen the same knife in the visor of appellant's father's car several days before the incident.  At that time, appellant said to McGee "[t]hat she was tired of people running up on her, and the next person that does, she was going to use it."  She also testified that Epps did not leave the apartment when Bates left and that only she and her neighbor were outside when appellant arrived.

At the conclusion of the testimony, the trial judge instructed the jury on excusable self-defense.  The trial judge rejected jury instructions based on justifiable self-defense and defense of others.  The trial judge also instructed the jury that if they found that appellant maliciously killed Bates, but did not find that the killing was "willful, deliberate, and premeditated, then you shall find [appellant] guilty of second degree murder."  After deliberating, the jury returned a verdict of second degree murder.

## II.

When reviewing a trial judge's decision refusing a proffered jury instruction, "'[t]he appropriate standard of review requires that we view the evidence with respect to the refused instruction in the light most favorable to [the proponent of the instruction].'"  Hartigan v. Commonwealth, 31

-

Va. App. 243, 257, 522 S.E.2d 406, 412 (1999) (citation omitted). "If any credible evidence in the record supports a proffered instruction . . . , failure to give the instruction is reversible error." Boone v. Commonwealth, 14 Va. App. 130, 132, 415 S.E.2d 250, 251 (1992). "The trial judge has a responsibility to instruct the jury on the applicable law so as to aid the jury in arriving at a proper verdict." Hartigan, 31 Va. App. at 257, 522 S.E.2d at 412. "In addition, where there is evidence which 'tends to sustain both the prosecution's and the defense's theory of the case, the trial judge is required to give requested instructions covering both theories.'" Alexander v. Commonwealth, 28 Va. App. 771, 775, 508 S.E.2d 912, 914 (1999) (citation omitted).

The testimony of appellant and Epps provided sufficient evidence from which the jury could have determined that appellant acted in self-defense of herself and her child. Appellant testified that she went to McGee's apartment to deliver her child for McGee to babysit and that she was not aware that Bates was at McGee's apartment. She testified that when she arrived at McGee's apartment, Bates, whom she had never met, began punching her. Appellant and Epps also testified that appellant was about to drive away when Bates opened the car's rear door where appellant's child was seated.

> Killing in self-defense may be either
> justifiable or excusable homicide.
> "Justifiable homicide in self-defense occurs

-

where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." "Excusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm."

Yarborough v. Commonwealth, 217 Va. 971, 975, 234 S.E.2d 286, 290 (1977) (citation omitted). "In the case of justifiable homicide, '[in which] the accused is free from fault in bringing on the fray, the accused "need not retreat, but is permitted to stand his [or her] ground and repel the attack by force, including deadly force, if it is necessary."'" Sands v. Commonwealth, 33 Va. App. 669, 678, 536 S.E.2d 461, 465 (2000) (citations omitted). Based on appellant's testimony, the trial judge erred in rejecting the justifiable self-defense instruction.

The error in not instructing the jury concerning justifiable self-defense was not harmless. "Because the evidence, viewed in the light most favorable to appellant, would support a finding that the homicide was justifiable, appellant had no duty under the law of self-defense to retreat in order to be entitled to the instruction." Id. at 680, 536 S.E.2d at 466. The jury was not instructed that if it believed appellant had

-

not retreated, the jury could have found that appellant acted in self-defense.

The evidence, viewed in the light most favorable to appellant, also supported an instruction on defense of others.

> "[A] person asserting a claim of defense of others may do so . . . where the person to whose aid he or she went would have been legally entitled to defend himself or herself."  Thus, one may be justified in using deadly force to defend another person where he or she reasonably believes that the person defended faces an imminent threat of serious bodily harm or death and that such person was not at fault in bringing about the necessity to use the deadly force.

Lynn v. Commonwealth, 27 Va. App. 336, 353, 499 S.E.2d 1, 9 (1998) (citation omitted).

Appellant and Epps testified that when appellant attempted to leave, Bates opened the car's rear door, where appellant's child was seated.  Jefferson also testified Bates was standing by the car's rear door.  Bates was cursing and enraged.  Based on Bates's actions, as described by appellant and Epps, the jury could have found that appellant reasonably feared that her child was in imminent danger of harm.  "The credibility of [appellant's] story was for the jury to determine in the light of all the other evidence, and [s]he was entitled to have [her] version of the evidence presented to them under a proper instruction or instructions."  Spear v. Commonwealth, 213 Va. 599, 601, 194 S.E.2d 751, 753 (1973).  The record establishes that "[t]he refused instruction was predicated upon

-

[appellant's] evidence and was a correct statement of the law."
Id. Thus, we hold the trial judge erred by not instructing the jury on defense of others.

### III.

At sentencing, appellant's attorney moved for a new trial contending that the prosecutor failed to divulge McGee's criminal conviction record. The record indicates McGee had at least fourteen felony convictions for forgery, larceny, and uttering, which were not disclosed to appellant and not revealed to the jury. Although the trial judge determined that the prosecutor improperly withheld from the defense this evidence, he concluded that his confidence in the jury's verdict was not undermined and found as follows:

> I've looked at the evidence through all the
> other witnesses, and although you make a
> point, . . . that [appellant's] statement
> wasn't written down; it wasn't recorded; it
> wasn't videotaped, but it was her statement
> and her statement was relayed to the jury
> and they could weigh those facts and
> determine how much weight to give it. And
> it certainly was enough in and of itself to
> prove not only second-degree murder. She
> had time to reflect. She went in the car,
> got the knife out after this initial
> encounter, and you had other testimony from
> Ms. Jefferson and this evidence alone in my
> opinion would not be enough to undermine the
> competence in the outcome of the verdict or
> that they probably would have entertained a
> reasonable doubt, and I will so rule and I
> will deny your motion to set aside the
> verdict for all the reasons as stated.

-

Appellant contends McGee's testimony was critical in the Commonwealth's effort to establish that appellant's conduct was intentional and resulted, as the prosecutor argued, from "hatred, anger or revenge." Appellant further contends "[n]o . . . witness other than McGee could have established this element of malice; thus, discrediting her was crucial to [appellant's] defense." We agree.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court outlined the following principles:

> A prosecution that withholds evidence . . . which, if made available, would tend to exculpate [the accused] or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though . . . his action is not "the result of guile."

Id. at 87-88 (citation omitted). Thus, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. "A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." United States v. Bagley, 473 U.S. 667, 674-75 (1985) (citation omitted).

-

In light of the violation, we must determine "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682. Proving that she did not go to McGee's apartment to confront Bates was critical to appellant's self-defense argument. McGee's testimony substantially contradicted appellant's testimony that she did not know Bates was at McGee's apartment that evening. McGee testified that while she was on the phone with appellant, appellant heard Bates in the background and asked was Bates there. McGee also denied that appellant was coming to her apartment so that she could babysit appellant's child.

Although the jury was not satisfied beyond a reasonable doubt that the killing was willful, deliberate, and premeditated and, therefore, did not convict appellant of first degree murder, this circumstance does not necessarily imply that the jury entirely rejected McGee's testimony that appellant called her and heard Bates in the background before she came over. Even if the jury rejected that testimony while concluding that appellant was not guilty of first degree murder, the jury could have found, based on McGee's testimony, that appellant knew Bates was at McGee's apartment, that appellant went to McGee's apartment to confront Bates, and that appellant's actions were done with malice.

-

Moreover, even if, as the Commonwealth contends, the jury rejected entirely the testimony that appellant knew Bates was at McGee's apartment, other evidence of malice was established by McGee's testimony that appellant said a few days prior to the incident that she would use the knife on the next person that "ran up on her." The prosecutor argued to the jury that this comment proved appellant's state of mind and told the jury: "McGee told you the defendant had the knife a couple of days before. She said she was going to kill the next person who ran up on her. She did in fact do that. She killed Latrice Bates." Furthermore, the record reveals that during their deliberations the jury inquired, "[W]as McGee's testimony that the knife was seen in the visor of a car other than [appellant's] three days prior?" The trial judge answered the jury's question by stating, "This is a factual matter which you must resolve." It is clear that the Commonwealth's proof of elements of the offense rested substantially upon McGee's credibility. McGee's testimony was pivotal to the Commonwealth's proof of appellant's purpose in going to McGee's apartment that evening.

The trial judge concluded that the jury could have also determined, based on the testimony of Sergeant Patrick and Jefferson, that appellant's decision to use the knife was not in self-defense or defense of her child or unborn baby but, rather, was done maliciously and with premeditation. As the Supreme

-

Court held in Kyles v. Whitley, 514 U.S. 419, 434 (1995), our analysis of this issue "is not a sufficiency of evidence test."

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Id. at 434-35.

"[W]hen the case is evaluated in the context of the entire record, including . . . [McGee's] omitted [felony convictions], a jury would have entertained a reasonable doubt regarding [appellant's] guilt." Soering v. Deeds, 255 Va. 457, 464, 499 S.E.2d 514, 517 (1998). Although Epps, who had not previously known appellant or Bates, confirmed appellant's testimony that Bates approached appellant and began hitting her, the prosecutor argued to the jury that they could disbelieve Epps because he was a convicted felon. Had the jury known McGee had been convicted of at least fourteen felonies, there is a reasonable probability that the jury would have weighed the testimony of appellant and Epps in a different light. The evidence of McGee's convictions could reasonably have led the jury to accept appellant's testimony that she went to McGee's apartment so that

-

McGee could look after her child and that, upon arriving at McGee's apartment, she was attacked by Bates, whom she had never seen and did not know.

In sum, all the evidence describes Bates as the enraged instigator of the argument. Appellant and Epps testified that when appellant attempted to drive away, Bates opened the door where appellant's child was seated. Their testimony, if believed, was sufficient to cast reasonable doubt on whether appellant acted with malice. In addition, in considering the undisclosed evidence, the jury may have been persuaded that appellant's actions were in self-defense or defense of her child. We hold, therefore, that the failure to provide the jury with McGee's substantial criminal record undermines confidence in the jury's verdict.

Accordingly, we reverse the conviction and remand the case for further proceedings.

<u>Reversed and remanded</u>.

-