# CIRCUIT COURT OF THE CITY OF ROANOKE

Sam McGhee et al.

v.

Zoning Appeals Board
of the City of Roanoke
and Westwin of Roanoke, L.L.C.

June 25, 2001

Case No. CL00-1203

BY JUDGE CLIFFORD R. WECKSTEIN

Retired Assistant City Manager Sam McGhee and others filed a petition for writ of certiorari, seeking judicial review of two October 3, 2000, orders of the Board of Zoning Appeals ("BZA" or "Board") of the City of Roanoke. The petitioners are Sam McGhee, Stuart H. Revercomb, Bob Crawford, Norvell West, Brooke Mallory, and Emily Mallory. The petition was filed pursuant to Virginia Code § 15.2-2314, which provides, in pertinent part, that:

Any person or persons jointly or severally aggrieved by any decision of the board of zoning appeals, or any aggrieved taxpayer or any officer, department, board or bureau of the locality, may present to the circuit court for the county or city a petition specifying the grounds on which aggrieved within thirty days after the filing of the decision in the office of the board.

Upon the presentation of such petition, the court shall allow a writ of certiorari to review the decision of the board of zoning appeals and shall prescribe therein the time within which a return thereto must be made and served upon the relator's attorney. ...

The return shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from and shall be verified.

If, upon the hearing, it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence. ... The court may reverse or affirm, wholly or partly, or may modify the decision brought up for review. ...

In these orders, the Board (i) overruled the Zoning Administrator's command that Westwin of Roanoke, L.L.C., stop work on a 24-unit residential condominium structure under construction on a tract known as "Cherry Hill" in the "South Roanoke" area of the city; and (ii) granted Westwin a variance that will permit the building to stand as much as 72 feet above grade. Without a variance, building height would be limited to 35 feet. There is no material dispute among the parties about the salient facts of the case.

### Standing

Contrary to the position taken by Westwin and the Board, I am satisfied that the petitioners have legal standing to maintain this suit.

It seems to me useful to approach standing in a case of this sort as "a factual determination made upon an objective view of all circumstances as they reasonably appeared to [each petitioner]" "determined from the viewpoint of [each petitioner]" in much the same way, *e.g.*, that courts approach self-defense in criminal cases, *see Sands v. Commonwealth*, 33 Va. App. 669, 536 S.E.2d 461 (2000), or justification for refusal of treatment in workers' compensation cases, *see R. G. Moore Building Corp. v. Mullins*, 10 Va. App. 211, 213, 390 S.E.2d 788 (1990) (from which the quotations come). This makes sense because of the purpose for which standing inquiries are raised:

The concept of standing concerns itself with the characteristics of the person or entity who files suit. The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case. In asking whether a person has standing, we ask, in essence, whether he

has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed.

*Cupp v. Board of Supervisors*, 227 Va. 580, 588, 318 S.E.2d 407 (1984). Beyond question, this case is a contest between actual adversaries.

To have standing to seek review of a BZA decision pursuant to Code § 15.2-2314, one must be "aggrieved," which means that she or he must assert the existence of "a substantial grievance," "a denial of some personal or property right ... or imposition of a burden or obligation ... different from that suffered by the public generally." *Virginia Beach Beautification Commission v. Board of Zoning Appeals*, 231 Va. 415, 344 S.E.2d 899 (1986). His or her interest "must be direct, immediate, pecuniary, and substantial." *Id.*

The petitioners reasonably perceive that the net effect of the Board actions under review is construction of a building that not only stands more than twice as high as the normally-permitted height of structures in the mixed-use area in which Cherry Hill is located, but that, because of the grade on which the construction is taking place, towers even higher above the neighborhood. These petitioners own property, live, and work in this neighborhood. "They are the aggrieved persons," just as surely as "the parties who may be adversely affected by the construction of a radio tower in a particular residential district are those persons who own or live on property within, or in close proximity to, the district." *WANV, Inc. v. Houff*, 219 Va. 57, 64, 244 S.E.2d 760 (1978). Though they may share this burden with some South Roanoke neighbors, it is not one suffered by the public generally.

Among the petitioners are property owners who, as Westwin and the Board concede, are qualified under the law of Virginia to give opinion evidence about the value of their property. They testified that Westwin's building will have a marked and adverse effect on the market value of homes in which they live and on the rental value of investment property which one of them rents for residential use to others. *See Snyder Plaza Properties v. Adams Outdoor Advertising*, 259 Va. 635, 644, 528 S.E.2d 452 (2000); *Parker v. Commonwealth*, 254 Va. 118, 121, 489 S.E.2d 482, 483 (1997); *Haynes v. Glenn*, 197 Va. 746, 750, 91 S.E.2d 433, 436 (1956).

Westwin presented expert testimony from two witnesses, one of whom, in addition to his professional qualifications, owns and lives in the single-family dwelling closest to the building under construction. Their testimony about effect on market value was directly contrary to the testimony of petitioners. The fact that the evidence is in conflict and that a trier of fact might, on this point, choose to accord greater weight to the testimony of

Westwin's witnesses than the testimony of the petitioners does not alter the fact that the petitioners are competent to testify about the value of their own property and the impact of this construction on that value and did so. Decisions about the weight and effect of evidence have little or no impact on the question of standing to sue. *Cf. Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115, 60 L. Ed. 2d 66, 99 S. Ct. 1601 (1979) (Discussing standing, Justice Powell wrote, "The most obvious source of [economic] harm would be an absolute or relative diminution in value of the individual [parties'] homes. This is a fact subject to proof before the [trial] Court. ..."); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 34 L. Ed. 2d 415, 93 S. Ct. 364 (1972) (Discussing standing: "What the proof may be is one thing. ..."). "Standing to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action." *Andrews v. American Health & Life Ins. Co.*, 236 Va. 221, 226, 372 S.E.2d 399 (1988).

One of the petitioners testified that he and his family engaged in extensive and expensive remodeling, carefully placing a window to take advantage of a magnificent view now obscured by Westwin's building. It is objectively reasonable for a person standing in his shoes to perceive, as this petitioner does, direct, immediate, pecuniary, and substantial impact from the appealed rulings of the BZA. *See Virginia Beach Beautification Commission v. Board of Zoning Appeals, supra*, 231 Va. 415, 344 S.E.2d 899 (1986). Among the petitioners are persons whose testimony demonstrates sincere and rationally-based belief that South Roanoke is a place of special character and charm that will be forever detrimentally altered if Westwin's building is allowed to stand in the place, and at the height, that the Board has authorized. *See Sierra Club v. Morton*, 405 U.S. 727, 734-35, 31 L. Ed. 2d 636, 92 S. Ct. 1361 (1972) (Noneconomic injuries — "aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society" — may suffice to demonstrate standing, so long as "the party seeking review be himself among the injured.") (federal law).

Westwin and the Board suggest that even if one, or some, of the petitioners meet the test of legal standing, others do not. This is of no moment. *Blanton v. Amelia County*, 261 Va. 55, 59, n. *, 540 S.E.2d 869, n. * (2001).

## The Zoning Administrator's Decision

Code § 15.2-2311 provides, in pertinent part:

A. An appeal to the board [of Zoning Appeals] may be taken by any person aggrieved or by any officer, department, board or bureau of the locality affected by any decision of the zoning administrator or from any order, requirement, decision or determination made by any other administrative officer in the administration or enforcement of this article or any ordinance adopted pursuant thereto. ... The appeal shall be taken within thirty days after the decision appealed from by filing with the zoning administrator, and with the board, a notice of appeal specifying the grounds thereof. ...

C. In no event shall a written order, requirement, decision or determination made by the zoning administrator or other administrative officer be subject to change, modification or reversal by any zoning administrator or other administrative officer after sixty days have elapsed from the date of the written order, requirement, decision or determination where the person aggrieved has materially changed his position in good faith reliance on the action of the zoning administrator or other administrative officer unless it is proven that such written order, requirement, decision or determination was obtained through malfeasance of the zoning administrator or other administrative officer or through fraud. The sixty-day limitation period shall not apply in any case where, with the concurrence of the attorney for the governing body, modification is required to correct clerical or other nondiscretionary errors.

Westwin appealed Zoning Administrator Evelyn Dorsey's July 14, 2000, decision to issue a Notice of Violation and Stop Work Order. Westwin contended that the sixty-day limitation in § 15.2-2311(C) prohibited the Zoning Administrator from issuing this Stop Work Order. The Board agreed with Westwin. This "court's review is limited to determining whether the decision of the board of zoning appeals is plainly wrong or is based on erroneous principles of law." *Board of Zoning Appeals of James City County v. University Square Associates*, 246 Va. 290, 294-95, 435 S.E.2d 385 (1993). "On review before the trial court, the decision of a board of zoning appeals 'is presumed to be correct and can be reversed or modified only if the trial court determines that the BZA applied erroneous principles of law or was plainly wrong and in violation of the purposes and intent of the zoning ordinance' and 'the party challenging the BZA's decision has the burden of proof on

these issues'." *Higgs v. Kirkbride*, 258 Va. 567, 573, 522 S.E.2d 861 (1999) (citations omitted).

These are the undisputed facts at the heart of the case.

One side of the Cherry Hill property borders a service alley that runs behind a row of commercial buildings on Crystal Spring Avenue, S.W. The other three sides of the property are bounded by Carolina Avenue, 22nd Street, and 23rd Street. Westwin acquired the Cherry Hill tract in 1997 and built upon it a 24-unit condominium building that conformed with existing zoning restrictions, which include a 35-foot height limit. This building, fronting on Carolina Avenue, was intended as the first phase of a three-phase development plan. The tract had been undeveloped except for an historic "mansion" that remains on the site.

The Cherry Hill property is approximately five acres in size. It is in an area zoned RM-2, which allows a mixture of uses, including multi-family and single family dwellings, commercial businesses, retail shops, churches, and medical facilities.

In late 1998, Westwin submitted an application to the BZA, seeking a variance that would permit it to build two four story, 72 foot high, structures. With its application, Westwin submitted a schematic drawing that showed one of the proposed buildings (designated as "Phase II") parallel to 22nd Street, and the other ("Phase III") parallel to the service alley. In January 1999, the Board approved the requested height variance for Phase II of the project; Westwin withdrew the application for Phase III. In hearings before the BZA, Westwin focused on the need to build "up rather than out" in order to preserve natural vegetation and large, old-growth trees.[1] No one sought judicial review of the decision to grant this height variance.

As site work got underway, Westwin, which already knew that the Cherry Hill property was topographically unusual — from the center of the property, it falls dramatically to the edges — learned that the topography parallel to 22nd Street was not what it had hoped. In order to build its structure parallel to that street, Westwin learned, it would have to spend approximately $500,000 to excavate rocks. This rendered construction parallel to 22nd Street economically unfeasible. Westwin's engineer asked J. Thomas Tasselli, the City's Development Review Coordinator and acting Zoning Administrator, whether, within its existing variance, Westwin could "rotate" the building 90 degrees, so that it would be parallel to the service

---

[1] Public policy of the City of Roanoke, as articulated in City Code § 36.1-585, is that "during development, reasonable efforts shall be made to preserve and protect: (1) trees of six-inch caliper or larger and ornamental trees. ..."

alley. After consideration and, as he testified before the BZA, "researching it thoroughly," Tasselli informed Westwin that it could do so. When making his decision, he later testified, he focused in part on a drawing in the BZA's January 1999 record, which apparently mislabeled 22nd Street as "alley." Though he did not focus on them, there were other drawings in the file that showed the building's long side parallel to 22nd Street. He understood that Westwin was asking to change the building's orientation and later testified that he was not misled by Westwin, or anyone else, in the matter.

Once Tasselli informed it that it could proceed, Westwin submitted a revised site plan, showing the long side of the building parallel to the alley. The City approved the site plan on December 14, 1999, and formally advised Westwin of approval on February 1, 2000. The City issued the building permit for the 24-unit building in the revised location and wrote a letter intended to assure Westwin's lender that Westwin's construction plans conformed with City ordinances and regulations. Westwin proceeded with construction.

Following complaints from owners of commercial property along the service alley that the building Westwin was constructing was not the one for which a variance had been granted, Zoning Administrator Dorsey issued her July 14, 2000, Stop Work Order.

The BZA received evidence that Dorsey and Tasselli, the City's Zoning Administrator and Development Review Coordinator, had, more than 60 days before July 14 and on several occasions (including February 1, 2000, March 3, 2000, and March 31, 2000), issued written orders, decisions, or determinations that the building about which the petitioners complain — in the location and at the height about which they complain — complied fully with all applicable requirements of Roanoke City's zoning laws and regulations.

The Board also received evidence that, in good-faith reliance on these written orders, decisions, or determinations, Westwin, *inter alia*, signed a $4.5 million construction contract and obtained a $5.5 million construction loan from Bank of America, N.A., of which approximately $1.25 million had been advanced by the bank before the Stop Work Order was issued. The Board received evidence that on March 31, 2000, when Zoning Administrator Dorsey wrote to Westwin's lawyer, advising of her determination that Westwin's project was in compliance with all legal requirements of the City of Roanoke and had received a variance for the building it was constructing, the precise purpose for which she did so was to permit Westwin to obtain this loan from Bank of America, *i.e.*, to change its position. That change of position, the Board learned from evidence, could not have taken place

without the Zoning Administrator's written determination. There was no material dispute about any of this evidence.

In short, the BZA received evidence, that, if accepted by the Board, would suffice to support a decision that the time-bar of Code § 15.2-2311(C) precluded the Zoning Administrator from issuing the Stop Work Order. The Board's conclusion that the various writings referred to in the record were orders, decisions, or determinations is not plainly wrong. Once the Board received evidence that Westwin could not have received its loan without the Zoning Administrator's determination of compliance, its members were entitled to conclude that this change of position was, therefore, in reliance upon Dorsey's written determination. Engaging in the deferential review that is required under the law, no court can say that the Board's decision was plainly wrong, nor is there any basis upon which to conclude that the Board applied erroneous principles of law.

The petitioners say that § 15.2-2311(C) is inapplicable for two reasons. First, noting that the statute's time-bar provisions are inapposite to necessary corrections of "clerical or other nondiscretionary errors," they contend that the Stop Work Order was such a correction. Alternatively, they argue that each "written order, requirement, decision, or determination was obtained through malfeasance of the zoning administrator or other administrative officer or through fraud," likewise making the time-bar inapplicable under the terms of the statute. Neither argument is persuasive.

For this discussion, I assume without deciding that in issuing permits to Westwin and in the other written orders, decisions, and determinations involved in this case, Dorsey, Tasselli, and other City officials engaged in nondiscretionary acts. *See Richlands Medical Association v. Commonwealth,* 230 Va. 384, 386, 337 S.E.2d 737 (1985); *Lewis v. Christian,* 101 Va. 135, 43 S.E. 331 (1903). The words "nondiscretionary errors," however, must be read in the context in which they appear in § 15.2-2311(C). *See Forst v. Rockingham Poultry Marketing Cooperative, Inc.,* 222 Va. 270, 278, 279 S.E.2d 400 (1981). And, of course, "when the language of a statute is clear and unambiguous, the statute's plain meaning must be accepted." *Roberts, Executor v. Roberts,* 260 Va. 660, 668, 536 S.E.2d 714 (2000). This statute provides that "the sixty-day limitation period shall not apply in any case where, with the concurrence of the attorney for the governing body, modification is required to correct clerical or other nondiscretionary errors."

The Board had evidence from which it could conclude that the Stop Work Order was not a "modification" of anything, but, rather, that it reversed

completely numerous administrative actions taken over several months.[2] While the record contains discussion between the Board and the assistant City Attorney about the scope of the Board's power and authority, there is no indication in the record that the City Attorney concurred in a tacit decision, much less an explicit one, that the Stop Work Order was required to correct any clerical or other nondiscretionary decision.

Useful analogy might be drawn from cases decided under Virginia Code § 8.01-428(B), which permits trial courts to correct at any time "clerical mistakes in all judgments or other parts of the record and errors therein arising from oversight or from an inadvertent omission." *See, e.g., Davis v. Mullins*, 251 Va. 141, 149-50, 466 S.E.2d 90 (1996): "The power to amend should not be confounded with the power to create ... it is restricted to placing upon the record evidence of ... action which has actually been taken, and presupposes action taken at the proper time." (Citation omitted.) It is impermissible to "permit a trial court ... to consider at any time what judgment it might have rendered while it still retained jurisdiction over a case and then to enter that judgment *nunc pro tunc.*" *Id.* Especially when one considers Tasselli's October 2000 testimony (further discussed below), that even at that time he did not know whether he had made an erroneous decision when Westwin asked about "rotating" the building, or what decision he would make "if we were to rewind in history," the record amply supports a conclusion by the Board that the Zoning Administrator's decision to issue the Stop Work Order was *not*, either in intended purpose or effect, to correct a "clerical or nondiscretionary error" earlier made in her office. A judge, giving the required deference to the BZA, assuredly cannot say that the Board committed plain error.

Malfeasance is defined as "a wrongful or unlawful act, especially wrongdoing or misconduct by a public official." *Black's Law Dictionary* (7th ed. 1999) at 968. It is, of course, different from negligence, misfeasance (improperly doing what one has a legal right to do), or nonfeasance (failure to do what one should do). *Cf.* Code § 15.2-2308(D) (a statute *in pari materia*). Malfeasance requires *mala fides*. As I view the record, there is no evidence from which either the Board or a reviewing court could make a finding of malfeasance by the Zoning Administrator or by any other administrative officer; the BZA surely committed no plain error, then, by failing to find

---

[2] To "modify" is "1. To change in form or character; alter. 2. To make less extreme, severe, or strong." *American Heritage Dictionary of the English Language* (3d ed. 1992). *Compare, e.g.,* to "negate," 1. To make ineffective or invalid; nullify. 2. To rule out; deny." *Id.*

malfeasance. The petitioners argue, however, that Westwin procured the public officials' written determinations by constructive fraud.

One alleging constructive fraud must prove that "a false representation of a material fact was made, innocently or negligently, and that the injured party suffered damage as a result of his reliance on the misrepresentation. ... In addition, the evidence must show that the false representation was made so as to induce a reasonable person to believe it, with the intent that the person would act on this representation." *Henderson v. Henderson*, 255 Va. 122, 126, 495 S.E.2d 496, 499 (1998).

The petitioners' argument centers around an "elevation," a schematic drawing submitted by Westwin to the Board on January 5, 1999, when Westwin was seeking variances to erect two buildings. According to Tasselli's testimony before the Board in October of 2000, an "error existed on the elevation ... the alley was misrepresented and, in fact, should have been 22nd Street. ... the elevation that was submitted showed an alley and not 22nd Street as it should have been labeled." Dorsey explained that this was one of "two renderings that were submitted by [Westwin] during the public hearing. ... One was a site plan showing the footprint of the building and the other was an elevation showing the building and below the building an area called alley."

The members of the Board heard and evaluated the evidence on this point. Assuming, *arguendo*, that the Board concluded that the drawing was a false representation of a material fact, its members reasonably could have concluded the representation was not made for the purposes of influencing any material decision made by Dorsey or Tasselli, the individual who testified that he looked at and considered the incorrect drawing during the course of attempting to respond to Westwin's question about rotating the building on the site.

Tasselli had, as Westwin notes, been present throughout the proceedings in January of 1999, when the original variance was issued. He was thoroughly conversant with all aspects of the situation. Even assuming, for this discussion, that the BZA believed that the City, the Board, Dorsey, Tasselli, or some or all of them were innocent parties who suffered damage, a decision by the Board that the false representation was *not* made in order to induce belief, with the intent that it be acted upon, would have been supported by the evidence and not clearly erroneous.

The Board also could very well have concluded that the misrepresentation was not material when made or when acted upon. Such a conclusion, for which there was evidentiary support, would not have been plainly wrong. In an October 2000 hearing, a member of the BZA asked Tasselli, "If you had to make the same decision all over again, would you

make the same decision that you made?" After answering, "I can't say," Tasselli went on to discuss, not the drawing that erroneously showed the placement of the alley, but the absence from his file of other plans, which could have altered his decision. Tasselli was questioned, at the same hearing, about whether, in August of 2000, he had told Westwin's attorney that he did not believe he had made a mistake in concluding that Westwin was permitted to "rotate" the building. He acknowledged having made that statement. Although the syntax is difficult to interpret, the BZA would have been entitled to conclude that Tasselli was telling it, in October of 2000, that he still thought his initial advice to Westwin, that it could rotate the building, was proper.[3] Tasselli affirmatively told the Board that he did not perceive that he had been misled.

Perhaps worthy of passing note is the fact that no member of the BZA made any statement on the record indicating that he or she or any other member perceived or suspected fraud, actual or constructive. At the October 3 meeting, the Board's chairman suggested, quite gently, that "honest mistake" by the Board's staff in "the actual enforcement," despite the fact that "the Board was clear in its original decision" caused the pickle in which the Board found itself. "For whatever reason," the chairman opined, or due to "glitches that occurred inadvertently in this process," the Board had and was relying upon accurate information available when it made its 1999 decision, and "for whatever reason, that didn't carry on to you, Mr. Tasselli."

In a reply brief in this court, counsel for the BZA writes: "It is difficult to conceive how there was any fraud, actual or constructive, when Westwin's engineer asked Tasselli for permission to change the building location, Tasselli and the engineer both obviously understood that the original plan had been to put the building along 22nd Street; otherwise the question never would have been asked." The Board was advised by the City Attorney that it could consider fraud. There was evidentiary support for the Board to view the question of fraud in precisely the way its attorney states it in this court, and the Board was not plainly wrong in its decision to reject the constructive fraud argument.

---

[3] Among the things Tasselli said: "It was not clear on January 5th [1999] that the Board realized that the elevation that was submitted showed an alley and not 22nd Street as it should have been labeled. But at the time I made those decisions, and I maintain today, that based on that plan information there was no error, and the hardships that apply now and apply to the site locating building the way it is currently or where it is on 22nd Street would still apply."

The petitioners have not carried their burden of demonstrating that, in reversing the Zoning Administrator's Stop Work Order, the BZA applied erroneous principles of law or was plainly wrong.

## The Variance

The Board argues that, in contesting the height variance that the Board granted to Westwin in October of 2000, the petitioners are, in effect, tilting at windmills. In 1999, the Board had granted Westwin a variance that permitted it to erect a structure 72 feet above grade, the height about which the petitioners now complain, in the same place, though oriented differently. There was no appeal from that decision, and the Board argues that that decision is, therefore, "a thing decided," impervious to judicial review. *Lilly v. Caroline County*, 259 Va. 291, 296, 526 S.E.2d 743 (2000). When Westwin, at the same time it successfully appealed the Zoning Administrator's Stop Work Order, sought and obtained a new height variance it was, it says, simply engaging in a "belt and suspenders" precaution. Once the Stop Work order was lifted on appeal to the BZA, Westwin and the Board argue, the construction was carried out pursuant to the variance issued in 1999. These arguments have persuasive force. "In the land use context, a landowner may be precluded from making a direct judicial attack on a zoning decision if the landowner has failed to exhaust 'adequate and available administrative remedies' before proceeding with a court challenge." *Id.* (citations omitted).

"The duty of this court as of every other judicial tribunal, is to decide actual controversies ... and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Potts v. Mathieson Alkali Works*, 165 Va. 196, 225, 181 S.E. 521 (1935) (citation omitted). Normally, determination of whether a question is moot depends upon whether the circuit court is asked to decide an actual controversy injuriously affecting the rights of a party to the litigation. *Hardy v. Board of Zoning Appeals*, 257 Va. 232, 235-36, 508 S.E.2d 886 (1999). "Jurisdiction is not necessarily defeated," however, "if the underlying dispute ... is one 'capable of repetition, yet evading review'." *Department of Taxation v. Delta Air Lines, Inc.*, 257 Va. 419, 427, 513 S.E.2d 130 (1999) (citations omitted).

According to the transcript of the October 3, 2000, meeting, after the Board voted to overturn the Stop Work Order, Westwin's lawyer expressed the view "that the variance already in place applies to this building and that this building is properly situated, and as far as I would be concerned you don't have to move on and enact a new variance." The chairman of the BZA

asked, "I think you are saying actually that it makes the hearing of the second item moot," and Westwin's lawyer answered, "I believe it does." When the assistant City Attorney opined that "a second variance is needed," the chairman, saying "It sounds to me it is even a safeguard for your client," moved on to discussion of and vote on the merits of the variance request.

This case is before the court pursuant to Code § 15.2-2314, under which the "court may reverse or affirm, wholly or partly, or may modify the decision brought up for review." Westwin sought a variance in 2000, the BZA granted the variance, and the petitioners timely sought review of that decision. At least arguably, a court hearing a case brought pursuant to § 15.2-2314 must make one of the dispositions specified in that statute. A determination that the decision brought up for review is moot would be "none of the above." I will carry out the review mandated by statute and thus assume the existence of a justiciable controversy about the BZA's 2000 decision to grant a height variance. There are several additional reasons for doing so.

The BZA's January 5, 1999, order granting Westwin's request for variance authorized the Zoning Administrator "to issue the proper permit(s) for said use in accordance with the decision of the Board, with the understanding that it is null and void if such permit(s) is not obtained within six months from the date of this order." The legal effect of this murky language, the petitioners contend, was to render the 1999 variance a nullity, since the building permit for this structure was not issued until March of 2000. If this view is correct (a position never taken by the Board or Zoning Administrator, and which finds no support in the statutory grant of authority to municipalities or boards of zoning appeals, and for which no case authority is cited), then it would seem that the controversy over the Stop Work Order, though full of sound and fury, signifies nothing; that the only issue for decision in this case is whether the Board's 2000 variance order should be reversed, affirmed in whole or in part, or modified.

*Lilly v. Caroline County, supra,* the cases cited in *Lilly,* and similar cases address situations where landowners failed to seek review by a BZA of a Zoning Administrator's decision, not cases, like this one, in which an unreviewed decision of a BZA is relied upon as the "thing decided."

Considerations of judicial economy auger in favor of the trial court's deciding both of the points upon which the petitioners sought review. Otherwise, if the Supreme Court were to determine that I erred in my decision about the BZA's review of the Zoning Administrator's Stop Work Order, the Court might find it necessary to remand the case for consideration of the other question raised in the petition for writ of certiorari. *Cf. Brown v. Koulizakis,* 229 Va. 524, 531, 331 S.E.2d 440 (1986) (motions to strike);

*West v. Commonwealth*, 16 Va. App. 679, 685-86, 432 S.E.2d 730 (1993) (judicial economy and efficiency promoted when trial court reconsidered and vacated suppression order after appeal noted); *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 403, 337 S.E.2d 744 (1985) ("judicial economy requires that litigants have one, but only one, full and fair opportunity to argue a question of law. The time required to hear a litigant reargue a question a second time must be taken from other litigants who are waiting to be heard.")

And finally, I will review the Board's decision to grant a variance for the building now under construction because, to one not trained in the law, *this* might be the question it seemed logical to start with.[4]

To reiterate, "the BZA's decision is presumed to be correct and can be reversed or modified only if the trial court determines that the BZA applied erroneous principles of law or was plainly wrong and in violation of the purposes and intent of the zoning ordinance. The party challenging the BZA's decision has the burden of proof on these issues." *Foster v. Geller*, 248 Va. 563, 567, 449 S.E.2d 802 (1994) (citations omitted).

A discussion of variances begins with basic principles of the law of zoning. Zoning, by statutory definition, is "the process of classifying land within a locality into areas and districts … by legislative action and the prescribing and application in each area and district of regulations concerning building and structure designs, building and structure placement and uses to which land, buildings and structures within such designated areas and districts may be put." Code § 15.2-2201.

Through its zoning ordinance and land use regulations, Roanoke seeks to implement its comprehensive plan and promote the general welfare and to achieve a number of specific purposes: providing adequate light and air, reducing or preventing traffic congestion, preventing overcrowding, protecting and enhancing the character and stability of existing neighborhoods, protecting against destruction of or encroachment upon

---

[4] As every American law student and lawyer knows, Justice Holmes wrote that "The life of the law has not been logic; it has been experience." Oliver Wendell Holmes, Jr., *The Common Law* (1881) at 1. The Great Dissenter was answering Sir Edward Coke who, in his *First Institute* wrote, "Reason is the life of the law; nay, the common law itself is nothing else but reason." Edward Coke, *The First Part of the Institutes of the Laws of England, Or, a Commentary upon Littleton* (1658) at 1. "My analysis of the judicial process comes then to this, and little more: logic, and history, and custom, and utility, and the accepted standards of right conduct, are the forces which singly or in combination shape the progress of the law." Benjamin Cardozo, *The Nature of the Judicial Process* (1921) at 112.

historic areas which contribute to the character of the city, facilitating the creation of a convenient, harmonious, and attractive community, protecting the natural beauty and special features of the city and the surrounding region, and promoting economic development. Roanoke City Code § 36.1-1; *see* Virginia Code § 15.2-2283. As noted earlier (*see supra*), the City's Code specifies that during property development, reasonable efforts must be made to preserve and protect trees of six inch caliper or larger, ornamental trees, and trees within setbacks, along property boundaries, or within twenty feet of streams or lakes, unless it is necessary to remove them for access, traffic circulation, utilities, drainage, or the like. City Code § 36.1-585.

Zoning ordinances came into currency in the United States early in the twentieth century. From the beginning, those who drafted legislation enabling localities to adopt such ordinances realized that consistency with the Fifth and Fourteenth Amendments would require that local governments be able to vary the strict application of zoning classifications. "In the field of zoning, the line which 'separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions.' *[Village of] Belle Terre [v. Boraas]*, 416 U.S. 1 at 4 [1974], quoting from *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 71 L. Ed. 303, 47 S. Ct. 114 (1926)." *Manassas v. Rosson*, 224 Va. 12, 18-19, 294 S.E.2d 799 (1982). "Because a facially valid zoning ordinance may prove unconstitutional in application to a particular landowner, some device is needed to protect landowners' rights without destroying the viability of zoning ordinances. The variance traditionally has been designed to serve this function. In this role, the variance aptly has been called an 'escape hatch' or 'escape valve'." *Packer v. Hornsby*, 221 Va. 117, 122, 267 S.E.2d 140 (1980); *accord, Adams Outdoor Advertising, Inc. v. Board of Zoning Appeals*, 261 Va. 407, 414, 544 S.E.2d 315 (2001).

As the Supreme Court recently explained:

In pertinent part, Va. Code § 15.2-2201 defines a "variance" in the context of a zoning ordinance as a reasonable deviation from those provisions regulating the size or area of a lot or parcel of land, or the size, area, bulk or location of a building or structure when the strict application of the ordinance would result in unnecessary or unreasonable hardship to the property owner. ...

In pertinent part, Va. Code § 15.2-2309(2) grants a board of zoning appeals the power to authorize a variance as defined in § 15.2-2201:

where by reason of the exceptional narrowness, shallowness, size or shape of a specific piece of property at the time of the effective date of the ordinance, or where by reason of exceptional topographic conditions or other extraordinary situation or condition of the piece of property, or of the condition, situation, or development of property immediately adjacent thereto, the strict application of the terms of the ordinance would effectively prohibit or unreasonably restrict the utilization of the property or where the board is satisfied, upon the evidence heard by it, that the granting of the variance will alleviate a clearly demonstrable hardship approaching confiscation. ...

*Adams Outdoor Advertising, Inc. v. Board of Zoning Appeals, supra,* 261 Va. 407, 412, 544 S.E.2d 315 (2001).

Code § 15.2-2309 prohibits the BZA from authorizing any variance unless it finds:

a. That the strict application of the ordinance would produce undue hardship;

b. That the hardship is not shared generally by other properties in the same zoning district and the same vicinity; and

c. That the authorization of the variance will not be of substantial detriment to adjacent property and that the character of the district will not be changed by the granting of the variance.

The BZA's October 3, 2000, order made the necessary findings. (The petitioners acknowledge that the Board "gave lip service to the required findings.") The order recites that:

the Board has made the findings required by Section 36.1-655, Code of the City of Roanoke, (1979), as amended, and considered the criteria of such code section with respect to the granting of variances.

(Roanoke City Code § 36.1-655 mirrors Virginia Code § 15.2-2309.) The Board's order also recites that:

After considerable discussion concerning the actual placement of the building currently under construction, the Board found that there were significant topography problems on the original site proposal and that preserving the existing vegetation along that portion of the property was very desirable.

A court giving deferential review to the Board's decision cannot say that the decision to grant this variance was plainly wrong or based on erroneous principles of law. Rather, the evidence presented to the BZA and to this court demonstrates that there was substantial evidentiary support for the decision to grant a variance.

The Board received evidence from which it could conclude that exceptional topographic conditions, including the rocky terrain parallel to 22nd Street, rendered unfeasible the construction of a multi-unit condominium building fronting on that street, supporting a finding that "the actual placement of the building currently under construction," i.e., parallel to the service alley, was necessary. Westwin further presented testimony that the unusual topography of the Cherry Hill tract, approximately 1000 feet high near the middle, sloping about thirty feet toward the edges, make it difficult or impossible to engage in site-appropriate construction comporting with the policy of preserving and protecting trees of six-inch caliper or larger, as articulated in City Code § 36.1-585. The Board had evidence about the trees on the property and had heard testimony and argument (further discussed below) which addressed the proposition that the character and beauty of the neighborhood and the on-site trees and vegetation would be less disturbed by the structure under construction than by Westwin attempting to build the larger number of condominium units that could, in theory, be built within existing RM-2 height and density restrictions. The Board, having before it the goals of Roanoke's land-use ordinances and all of the facts presented by Westwin and its neighbors, decided that the loss of additional large trees constituted an undue hardship. Considering the testimony and argument presented to the Board and to this court about the natural beauty of the Cherry Hill property and the portion of South Roanoke that surrounds it, I cannot say that the Board's decision was plainly wrong.

Nor can I disturb the BZA's other findings; they are neither clearly wrong nor based on erroneous principles of law. As the evidence presented to the court demonstrates, the Cherry Hill property is unique in its zoning district and in its vicinity. The petitioners, during the course of hearings, questioned witnesses about two other pieces of property, neither of which is in the same zoning district nor is zoned for similar purposes. The burden was on the petitioners to demonstrate by evidence that the hardship the BZA identified was "shared generally by other properties in the same zoning district and the same vicinity," *see Higgs v. Kirkbride, supra*, 258 Va. at 573, and they produced no evidence to support that proposition. (If I may take "judicial notice of geographical facts that are matters of common knowledge" in the jurisdiction in which I sit, *McClain v. Commonwealth*, 189 Va. 847, 853, 55 S.E.2d 49, 52-53 (1949); *Sutherland v. Commonwealth*, 6 Va. App. 378, 381,

368 S.E.2d 295 (1988), of "whatever ought to be generally known within the limits of [this] jurisdiction," *Vaughan v. Town of Galax*, 173 Va. 335, 342-43, 4 S.E.2d 386, 389 (1939) (*quoting Redd v. Supervisors of Henry County*, 72 Va. (31 Gratt.) 695, 709 (1879)), *see also Baldwin v. Commonwealth*, 203 Va. 570, 572, 125 S.E.2d 858 (1962), then I can affirmatively find that property which is, as Westwin describes these two tracts in its post-trial memorandum, "on the other side of Franklin Road," is in no sense "in the same vicinity"). The hardships identified by the Board, the large number of old trees and the unusual geographical conditions, are unique to Cherry Hill. The size of the property makes the loss of these trees significant to the owners and to the neighborhood.

A reviewing court cannot find clearly erroneous a conclusion that the nature of the community will not be changed by the construction of this 72-foot high condominium building. The area is zoned for multiple purposes and includes multi-family dwellings, other condominiums, shops, businesses, churches, and detached single-family dwellings. While perhaps no other building close to Cherry Hill will stand quite as high as will Westwin's new condominium building, the Board discussed, and evidence presented to the court demonstrates, the fact that other tall buildings, including a medical building and parking garage, are located in the same vicinity. A major hospital and its multi-story parking garage also are located nearby. The record reflects that, toward the end of the discussion on these questions, the chairman of the BZA noted that "this is a mixed area, that is one of the things that makes that portion of South Roanoke unique. It has a mixture of things like hospitals and churches and commercial buildings, a tall parking garage." (When the parties argued this case, the petitioners urged me to visit the construction site in order to view the structure *in situ*, in its neighborhood context. The Board and Westwin agreed that I could do so, and I did.)

The BZA heard, orally and in writing, from persons who passionately and genuinely believed that a building of this height is totally out of character with the neighborhood and that the nature of the South Roanoke community will in fact be changed to its detriment by erection of this building in this place. The petitioners presented witnesses in court who so testified. Westwin presented in court the testimony of others, including experts, whose opinions were to the contrary; the Board heard, orally and in writing, from persons who did not perceive that the nature of the community would be changed by this building. Members of the board observed the structure under construction and the surrounding community and expressed their own views. To borrow a phrase from another area of land-use law, the question is "clearly debatable." Courts are not allowed, nor should they be, to substitute their judgments about such questions for those of the BZA, when, as here, there is credible

evidence to support the Board's decision. *See Alleghany Enterprises, Inc. v. Board of Zoning Appeals*, 217 Va. 64, 69, 225 S.E.2d 383 (1976) ("The evidence adduced by Alleghany tended to show that the residential zoning of the subject parcel was unreasonable and that a commercial zoning would be reasonable. But that is not the question before us. We cannot say as a matter of law that there was no credible evidence on which the Board could justify its denial of the variance.")

Nor can the court find that the Board, applying erroneous principles of law, granted Westwin a special privilege or convenience. *Compare, e.g., Riles v. Board of Zoning Appeals*, 246 Va. 48, 431 S.E.2d 282 (1993) (record was "devoid of any evidence suggesting that 'special conditions' exist," and BZA did not make the three findings that are prerequisites for granting of any variance); *Board of Zoning Appeals v. Nowak*, 227 Va. 201, 315 S.E.2d 221 (1984); *Packer v. Hornsby*, 221 Va. 117, 267 S.E.2d 140 (1980).

The petitioners correctly point out that "a self-inflicted hardship … whether deliberately or ignorantly incurred, affords no basis for the granting of a variance." *Allegheny Enterprises, supra*, 217 Va. at 69. They argue that this principle precludes Westwin from receiving a variance and that the BZA's decision must therefore be reversed because it is based on erroneous principles of law.

In *Spence v. Board of Zoning Appeals*, 255 Va. 116, 496 S.E.2d 61 (1998), an "aggrieved property owner" relied on *Alleghany Enterprises* and similar cases. The Supreme Court explained his mistake, a mistake that the petitioners also make in this case:

> His reliance on these decisions is misplaced because each of those cases involved property owners who had acted in violation of applicable zoning ordinances. In *Steele v. Fluvanna County Board of Supervisors*, 246 Va. 502, 436 S.E.2d 453, we held that the construction of a house in violation of side yard setback requirements, although done inadvertently, was a self-inflicted hardship. We stated that "a self-inflicted hardship, whether deliberately or ignorantly incurred, provides no basis for the granting of a variance." 246 Va. at 507, 436 S.E.2d at 457. In *Alleghany Enterprises, Inc. v. Board of Zoning Appeals*, 217 Va. 64, 225 S.E.2d 383, a property owner sought a variance to allow use of his property as an automobile sales lot. The property was zoned for residential use but was located adjacent to the owner's motor vehicle business. We held that any hardship the property owner suffered was self-inflicted because, after purchasing property zoned for residential use, he violated the zoning ordinance by using the property for purposes not

allowed in that land use classification. 217 Va. at 68-69, 225 S.E.2d at 386. In *Board of Zoning Appeals v. Combs*, 200 Va. 471, 106 S.E.2d 755, we reinstated a board of zoning appeals' decision denying an occupancy permit to a property owner who had constructed an apartment over an existing garage in violation of a zoning ordinance. We held that any hardship the owner suffered was self-inflicted. 200 Va. at 477, 106 S.E.2d at 759. Unlike the property owners in *Steele, Alleghany*, and *Combs*, Beagle did not violate a zoning ordinance provision and then seek relief from the consequences of that unlawful act. Instead, Beagle followed the procedures prescribed by Code § 15.1-495(2) and the City's zoning ordinance to obtain a variance before attempting to use the property. Beagle did not create his own hardship but only sought relief allowed by Code § 15.1-495(2) based on the configuration and the physical characteristics of his property. Thus, we conclude that the trial court did not err in upholding the Board's decision.

*Spence v. Board of Zoning Appeals, supra*, 255 Va. 116 at 120-21.[5] The same is true here. Westwin sought and obtained a variance and then, when it had a question about whether it could proceed with propriety pursuant to that variance, sought and obtained direction from the appropriate municipal officials. Before proceeding, and at every appropriate step, it armed itself with written determinations that it was in compliance with the zoning ordinance and regulations. In the factual context of this case, it is impossible to characterize the decision to continue construction during the pendency of the appeal of the Stop Work Order, or the pendency this suit, as a self-inflicted hardship.

The petitioners point to a statement, made by one of Westwin's principals, James E. Body, at a BZA meeting held on January 5, 1999, which,

---

[5] In *Spence*, the Supreme Court also summarily rejected an argument that is similar to one of the themes sounded by the petitioners in the case at bar. "We reject," the Court said, the argument that, since property was purchased by one who knew "that he needed a variance to build a house, the mere fact of his purchase constitutes a self-inflicted hardship that bars him from obtaining a variance." Under that analysis, the Court said, "nonconforming property could never be developed by obtaining a variance after the property is sold," which would render the applicable statutes meaningless. *Id.* at 120. Relevant to another argument advanced on brief by the petitioners, the Supreme Court in *Spence* said that "the purchase price of the property is irrelevant" to the purposes for which variances can be granted. *Id.*

they contend, precluded the Board from making a finding of "hardship." I do not agree.

Examination of that statement must begin with the BZA's meeting of December 8, 1998, when Body appeared before the Board to ask for a variance so that Westwin could build two 32-unit condominium buildings, each of which would be approximately 72 feet tall. After the chairman "read the request into the record and swore in all persons present who wished to speak on the request," the minutes of that meeting report:

> Mr. James Body appeared before the Board and stated that his main issue was the trees. He stated that Cherry Hill was zoned for 64 more units, but the fact of building these remaining units on the property would destroy every tree on that portion of the property. He submitted photographs of the trees that are on this property. Mr. Body stated that in the planning of this development, they had laid out 64 units. He showed the Board the site plan to the Board. [sic] (Enclosed in file.) He further stated that he thought the problem was that one of the ends of the property was covered with trees. [He described the alterations Westwin proposed to make in its original plans, reducing the number of units in one of the buildings, and increasing height.] Mr. Body stated that he was doing all this in an attempt to save trees on the property.
>
> Chairman Copty asked Mr. Body to clarify the height issue.
>
> Mr. Body responded by stating that if he would put the building on the top of the hill at a 1000 elevation, it would only be about five feet lower than moving it down to the bottom of the hill and only going four stories. He also stated that they were zoned for 64 units, but that they could only get 48 units on the site and that this proposal would save all the trees.

Additional discussion took place at that meeting, and the Board heard presentations on the subject by citizens who reside in the neighborhood. One of the members of the BZA repeatedly suggested that consideration of the request be postponed until the next meeting, and the Board continued the matter to its January 5, 1999, meeting.

The minutes of the discussion at that meeting of Westwin's application state that:

> Mr. James Body, representing Westwin of Roanoke, L.L.C., appeared before the Board and stated that he wanted to save the trees on the property. He stated that it was very difficult to put 64 units on

the property without cutting down a lot of trees, therefore, he was making the structure 48 units. ...

Mr. Talevi [an assistant City Attorney] asked Mr. Body to explain the hardship in seeking this variance to the height restriction.

Mr. Body stated that the hardship would be cutting down the trees and that this would destroy the value of everything around it.

Mr. Talevi asked Mr. Body to explain to him how removing the trees would be related to the height of the structure.

Mr. Body stated that if he would build on top of the hill which was filled with six (6) foot diameter hundred year old trees. ...

The minutes reflect substantial additional discussion at that meeting, during the course of which the BZA member who had suggested continuance of the variance request in December again questioned whether she had enough information upon which to act, and made a motion to postpone the request until the following month. The chairman, the minutes reflect, "asked Mr. Body if he would be able to come back next month." Then, the minutes show:

Mr. Body stated that he had given the Board what they had asked for and that he did not want to continue this issue. He stated that he would just erect 64 units on the property and cut down all the trees in South Roanoke.

So far as the minutes reflect, no one at the meeting thought this statement worthy of remark. On the other hand, the minutes do not reflect further discussion about a continuance. The record reflects that the Board continued for some time to discuss the Westwin request, then voted to grant the request for variance for Phase II, Body having withdrawn Westwin's request for Phase III.

The members of the BZA were entitled to conclude that Body's statement was hyperbole or bluster, that it was intemperate, arising from pique, impatience, or some other cause unrelated to the merits of the variance application, and that it was not worthy of further consideration. They likewise, of course, were entitled to treat it with utmost seriousness and to conclude — as the petitioners here urge — that it negated any claim of hardship. They were entitled to weigh the submissions made to them and to base their decisions on the their considered judgments about the weight and effect of the evidence and arguments. They were entitled to weigh this statement against all of Body's other statements to them. Under the law's standards for review of BZA decisions, the court must presume that the BZA

did not accept Body's statement as proof that Westwin could, would, or should develop 64 condominium units at Cherry Hill and cut down all the trees on that property, not to speak of "all the trees in South Roanoke." I am not entitled to make any more of Mr. Body's statement than, obviously, did the members of the Board.

The record reflects that the members of the BZA were acutely conscious of the fact that, before beginning construction, Westwin had sought and obtained approval to "rotate" the building from the appropriate authority and that Westwin's construction lender, among others, had received written assurances from City officials that Westwin was proceeding properly, armed with necessary variances.

Westwin's lawyer argued to the Board that, "here were discretionary acts by the City officials one after another, and if at this stage after Westwin, its contractor, its bank, the families who have contracted to buy buildings, people involved in everyday life, people like ourselves have their tables turned upside-down, I tell you the precedent would be that our process deserves no respect, it has no reliability, you never know where you stand." He suggested to the Board that sustaining the Zoning Administrator's Stop Work Order would set a "dangerous and reckless precedent," that might "destroy reliability or in some way damage credibility for our zoning process." Comments made by members of the Board demonstrate that similar thoughts were on their minds as they discussed the appeal and the variance application.

BZA chairman Benjamin S. Motley called the situation a genuine dilemma. One horn of that dilemma, he said, was that, if the Board ruled against Westwin, "you fly in the face of the credibility of the whole process of government for the City of Roanoke in terms of individuals, corporations, banks being able to depend on written orders, which were clearly made regarding the process."

"Now in my opinion," the chairman said, "if we do not grant [Westwin's] request it is the greater wrong, because it is one thing to be concerned about the height of a building and its impact on the neighborhood ... and all those kind of things. It is another thing, though for an individual to depend on written formal documentation and then not be able to rely on it with financial investments, with decisions affecting their lives being held in the balance."

Another member of the Board, William Light, noting that he himself had been Zoning Administrator for many years, expressed his concerns about construction going on "month to month to month," with governmental inspections taking place, "and the owner is building, building, building, going on and on ... then all of a sudden you come to me if I am building it and you

say, 'Whoops, you have got to stop, you are in violation' … it does bother me."

BZA member Sydnor W. Brizendine (who has died since the October 2000 hearing) mentioned during the discussion that, though he had not been a member when the 1999 variance was approved, he had for many years chaired the Board. He stated that he endorsed the views expressed by the chairman and Mr. Light. "This stop work order bothers me," he also said. "Here you built one phase of the thing and you have got all these condominiums, you are working on the other, millions of dollars have been spent, people have sold their homes anticipating moving into these things. … If a mistake was made and it was an honest mistake, it would appear to me that the builder had a right almost to continue."

Another BZA member, Clayton Grogan, stated that he agreed with Chairman Motley and the majority of his statements. After concisely stating that the "two issues at hand are the stop work order and was it issued erroneously, and the second issue is are there hardships on this property that would allow for this variance, and it seems pretty clear to me," he joined Light, Brizendine, and Chairman Motley in voting to overturn the Stop Work Order and to grant the variance.

Code § 15.2-2309's predicate for allowing a BZA to authorize a variance is that "owing to special conditions a literal enforcement of the provisions [of the zoning ordinance] will result in unnecessary hardship; provided that the spirit of the ordinance shall be observed and substantial justice done … where by reason of … other extraordinary situation or condition of the piece of property would … unreasonably restrict the utilization of the property or where the board is satisfied, upon the evidence heard by it, that the granting of the variance will alleviate a clearly demonstrable hardship approaching confiscation, as distinguished from a special privilege or convenience. …"

Reviewing the record, the court inescapably concludes that members of the Board perceived that these were, indeed, special conditions, and that the situation truly was extraordinary. Upon the evidence that they heard, these BZA members not only found that a variance was justified because of the large old-growth trees and the size, elevation, location, geologic makeup, and topography of this tract; they also found that granting the variance would, for the reasons they articulated and they heard Westwin's lawyer articulate, do substantial justice and alleviate a clearly demonstrable hardship approaching confiscation — "millions of dollars have been spent, people have sold their homes anticipating moving into these things," "lives [are] in the balance" — a hardship not only upon the property owner, cf. Adams Outdoor Advertising v. Board of Zoning Appeals, supra, 261 Va. at 414, but upon all who dealt with the property owner in reliance on the City's approvals and writings. The

members of the BZA made crystal clear their concern that, in this extraordinary situation, literal enforcement of the zoning ordinance would cause substantial injustice, as well as demonstrable and unnecessary hardship. No court deferentially reviewing this decision, made, as it was, by BZA members who were familiar with the neighborhood and vicinity in which Cherry Hill is located, and well-acquainted with the goals of the municipality's zoning ordinance, can find that the decision is "plainly wrong."

"Though they did not say so in legalistic language," the Board's attorney also argued, "what the BZA members were expressing was the view that by the time Ms. Dorsey issued the stop work order, Westwin had acquired a vested right to continue with its building." *See Town of Stephens City v. Russell,* 241 Va. 160, 163-64, 399 S.E.2d 814 (1991); *Fairfax County v. Cities Service Oil Co.,* 213 Va. 359, 193 S.E.2d 1 (1972). In these and similar cases, however, issuance of a special use permit by the BZA was one of the prerequisites to a finding of vested right. This is not a case in which the landowner claims that his vested rights have been impaired by "subsequent amendment to a zoning ordinance." *See* § 15.2-2307.

The petitioners have not carried their burden of proving that the Board of Zoning Appeals committed plain error or applied erroneous principles of law when it granted this request for a variance.

## Conclusion

Upon the record brought up before it on a petition for writ of certiorari and after consideration of evidence heard in open court, arguments of counsel, and decided authorities, the court affirms in whole the decisions of the Board of Zoning Appeals.